IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDWEST FENCE CORP.,

                  Plaintiff,

      v.

UNITED STATES DEPT. OF
TRANSPORTATION, *et al.*,

                  Defendants.

Case No. 10 C 5627

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

Before the Court are Defendant's Motions to Dismiss on various grounds.  For the reasons that follow, the Court denies Defendants' Motions to Dismiss for lack of standing.  The remainder of Defendants' Motions to Dismiss also are denied, with two exceptions.  Counts V through VII are dismissed with prejudice in regard to the Illinois Department of Transportation.  Counts XIV and XVI, seeking injunctive and monetary relief against the Illinois State Tollway Authority, are dismissed with leave to replead within 30 days from the date of this order.

## I.  BACKGROUND

Plaintiff Midwest Fence Corp. (hereinafter, "Midwest") is a Chicago-based guardrail and fencing contractor that bids on subcontracts for projects let by the Illinois Department of Transportation ("IDOT").  It brought the instant suit challenging the constitutionality of the U.S. Department of Transportation's

("USDOT") Disadvantaged Business Enterprise ("DBE") program. Midwest similarly challenges IDOT's implementation of the federal DBE program for federally funded projects, its implementation of its own DBE program for state-funded projects, and the Illinois State Toll Highway Authority's (the "Tollway") separate DBE program.

The suit names USDOT, its Secretary, Ray LaHood ("LaHood"), in his official capacity; and the Federal Highway Administration (the "FHWA") and its Administrator, Victor Mendez ("Mendez"), in his official capacity (hereinafter, collectively, the "Federal Defendants"). Also named are IDOT and Gary Hannig ("Hannig"), in his official capacity as Illinois Secretary of Transportation (the "IDOT Defendants"); and the Tollway, its Chairwoman, Paula Wolff, in her official capacity; Gov. Patrick Quinn and Hannig in their capacities as *ex officio* members of the Tollway board, and various directors of the Tollway (the "Tollway Defendants"). Midwest is seeking declaratory and injunctive relief against all the defendants, and monetary damages from IDOT and the Tollway.

The facts are taken from Midwest's Complaint, and, when appropriate, the relevant portions of the various statutes and relevant background provided by the Defendants in their motions to dismiss. When considering Defendants' motions to dismiss for failure to state a claim under FED. R. CIV. P. 12(b), the Court will presume the facts in Midwest's complaint to be true.

## A.  Parties

Midwest is a Delaware corporation with its main office in Chicago, Illinois.  It is owned and controlled by white males and does not qualify as a DBE under any of the challenged programs.  Midwest bids primarily as a subcontractor on contracts let by IDOT and the Tollway.

The USDOT is responsible for the maintenance of the nation's roads and highways.  The FHWA is an arm of USDOT that is responsible for carrying out highway design, construction, and maintenance duties.  The IDOT performs a similar role in Illinois.  The Tollway is an administrative agency of the state that constructs, regulates, and maintains Illinois' system of toll highways.  It is governed by an 11-member board of directors and, unlike IDOT, receives no federal funding.

## B.  The DBE Programs

The goal of the DBE programs is to increase the flow of public dollars for road construction to businesses owned by individuals who are socially or economically disadvantaged.

The federal DBE program is authorized by the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), *Pub. L. No. 109-59, 119 Stat. 1144* (2005)(codified as amended in scattered sections of 23 U.S.C. and 49 U.S.C.).  It provides, in relevant part, "[e]xcept to the extent that the Secretary determines otherwise, not less than 10 percent

of the amounts made available for any program under Titles I, III, and V of this Act . . . shall be expended through small business concerns owned and controlled by socially and economically disadvantaged individuals." 23 U.S.C. § 101(b). Federal regulations interpret this provision as setting an aspirational goal, providing, in relevant part:

> (a) The statutes authorizing this program provide that, except to the extent the Secretary determines otherwise, not less than 10 percent of the authorized funds are to be expended with DBEs.
>
> (b) This 10 percent goal is an aspirational goal at the national level, which the Department uses as a tool in evaluating and monitoring DBEs' opportunities to participate in DOT-assisted contracts.
>
> (c) The national 10 percent goal does not authorize or require recipients to set overall or contract goals at the 10 percent level, or any other particular level, or to take any special administrative steps if their goals are above or below 10 percent.

49 C.F.R. § 26.41.

With respect to federal projects, IDOT's DBE program is governed by USDOT regulations. IDOT also follows the federal regulations for its own state-funded road projects. In regard to the federal program, IDOT must set an annual, overall DBE participation goal, which must be submitted to the FHWA. 49 C.F.R. §§ 26.45(a)(1), (f)(1). The regulations define a DBE as a "for profit small business concern":

> (1) That is at least 51 percent owned by one or more individuals who are both socially and economically disadvantaged or, in the case of a corporation, in which

51 percent of the stock is owned by one or more such
individuals; and

(2) Whose management and daily business operations are
controlled by one or more of the socially and
economically disadvantaged individuals who own it.

49 C.F.R. § 26.5.

The regulations contain a rebuttable presumption that U.S.
citizens who are "women, Black Americans, Hispanic Americans,
Native Americans, Asian-Pacific Americans, Subcontinent Asian
Americans, or other minorities found to be disadvantaged by the SBA
[Small Business Administration] are socially and economically
disadvantaged individuals." 49 C.F.R. § 26.67(a)(1). Applicants
must submit a signed, notarized certification that each
presumptively disadvantaged owner is in fact disadvantaged. *Id.*
Members of these groups, then, are not required to prove they are
socially and economically disadvantaged. 49 C.F.R. § 26.61(c).
Individuals who do not fall within the presumptions must prove, by
a preponderance of the evidence, that they are socially and
economically disadvantaged. 49 C.F.R. § 26.61(d).

In order to show social disadvantage, individuals must
demonstrate that they have been "subjected to racial or ethnic
prejudice or cultural bias within American society because of their
identities as members of groups and without regard to their
individual qualities." 49 C.F.R. pt. 26, App. E. A number of
factors must be shown to meet this requirement, for example, that
"at least one objective distinguishing feature has contributed to

- 5 -

social disadvantage, such as race, gender, disability, long-term residence in an environment isolated from the mainstream of American society, or other similar cases not common to individuals who are not socially disadvantaged." *Id.* To show economic disadvantage, individuals must be socially disadvantaged and demonstrate that their "ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." *Id.*

Additionally, to be eligible to be a DBE, a firm must meet the definition of a small business as defined by the Small Business Administration. 49 C.F.R. § 26.65(a). The limit on annual receipts varies by type of business, but Defendants argue that the applicable regulation here is the one for "all other specialty trade contractors," which is $14 million. 13 C.F.R. § 121.201. Additionally, in order to qualify as a DBE, the firm's average gross receipts over the prior three years must not exceed $22.41 million. 49 C.F.R. § 26.65(b). Any individual whose personal net worth exceeds $1.32 million is not economically disadvantaged. 49 C.F.R. § 26.67(b)(1).

Midwest contends that although subcontractors receive only about 25 percent of the total contract dollars spent by IDOT, DBE goals are met almost exclusively through subcontracting dollars. For example, in federal fiscal year 2007, $1,354,577,435 went to

prime contractors as a whole, while $338,513,578 went to subcontractors. Companies classified as DBEs received $183,267,044 from IDOT, of which $146,532,174 came from subcontracting dollars. The reason for this, Midwest contends, is that the economic limitations on companies qualifying as DBEs make it impossible for them to bid on any but the smallest prime contracts. Midwest contends that recently IDOT has dramatically increased the DBE participation rates required by contract, to the point where its requirements threaten to drive non-DBE subcontractors out of the market.

The Tollway has instituted a voluntary program to increase participation of DBEs on its projects. The Tollway program mirrors the IDOT program, and the DBE certification requirements are the same as the federal requirements outlined above. Midwest contends that from 2006 to 2008, all contract dollars that went to DBEs from the Tollway flowed from prime contractors to their subcontractors. Again, because a company must be economically disadvantaged to qualify as a DBE, Midwest contends it is impossible for DBEs to bid on any but the smallest prime contracts.

### C. The Complaint

Midwest's 17-count complaint is confusingly labeled in places. (For example, it labels Counts I through VII as seeking declaratory relief from IDOT, Hannig, LaHood, and Martinez.) However, in its response to IDOT's Motion to Dismiss, Midwest has clarified the

relief it seeks. Counts I through IV seek declaratory relief against the Federal Defendants, specifically: (I) a declaration that the USDOT regulations are unconstitutional on their face; (II) a declaration that the USDOT regulations are unconstitutional as applied; (III) a declaration that the USDOT regulations have not been properly authorized by Congress; (IV) a declaration that SAFETEA-LU is unconstitutional. In various counts, Midwest partially seeks relief from the Federal Defendants pursuant to 42 U.S.C. § 1981 and Title VI of the Civil Rights Act, 42 U.S.C. § 2000d. However, Midwest acknowledges in its response brief that these statutes do not create a private cause of action against the Federal Defendants and voluntarily dismisses them. It clarifies that the relief it seeks against the Federal Defendants is based on the Equal Protection guarantee found in the Fifth Amendment's Due Process Clause.

Midwest also names the Federal Defendants in Count VIII, where it seeks injunctive relief under the *Ex parte Young* doctrine preventing LaHood and Mendez from implementing the USDOT regulations. In Counts V, VI, VII, IX, X, XI, and XII, Midwest seeks relief from the IDOT Defendants, specifically: (V) a declaration that state statutes authorizing IDOT's DBE program for state-funded projects are unconstitutional; (VI) a declaration that IDOT has not followed the USDOT regulations; (VII) a declaration that the IDOT DBE program is unconstitutional; (IX) injunctive

relief under the *Ex parte Young* doctrine preventing Hannig from implementing the IDOT DBE program; (X) injunctive relief under the Illinois Civil Rights Act, 740 ILCS 23/5, preventing IDOT from implementing the IDOT DBE program; (XI) money damages from IDOT under Title VI of the Civil Rights Act, 42 U.S.C. § 2000d; and (XII) money damages from IDOT under the Illinois Civil Rights Act of 2003. The remaining counts seek the following relief from the Tollway Defendants: (XIII) declaratory relief that the Tollway's DBE program is unconstitutional; (XIV) injunctive relief under the *Ex parte Young* doctrine preventing the Tollway board members from implementing its DBE program; (XV) injunctive relief under the Illinois Civil Rights Act preventing the Tollway from implementing its DBE program; (XVI) monetary damages from the Tollway on the ground that it waived its sovereign immunity through a provision of the Toll Highway Act, 605 ILCS 10/31; and (XVII) monetary damages from the Tollway under the Illinois Civil Rights Act.

## II. ANALYSIS

### A. Standing

All Defendants move to dismiss under FED. R. CIV. P. 12(b)(1) on the ground that Midwest lacks standing, and as such this Court lacks jurisdiction to hear the case, so the Court will begin its analysis there. Without standing, there is no case or controversy under Article III of the Constitution. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Standing requires: (1) that

the plaintiff have suffered an "injury in fact," that is, an invasion of a legally protected interest that is (a) concrete and personal and (b) actual and imminent, rather than hypothetical; (2) a causal connection between the injury and the complained-of conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. *Id.* at 560-61. Causation and redressability have been described as "two sides of a causation coin" because they typically overlap. *Dynalantic Corp. v. Dep't of Def.*, 115 F.3d 1012, 1017 (D.C. Cir. 1997).

Because standing is a jurisdictional requirement, the plaintiff has the burden of establishing it. *Apex Digital, Inc. v. Sears, Roebuck & Co.*, 572 F.3d 440, 443 (7th Cir. 2009). When defendants raise a factual challenge to standing, as they do here, the district court may look beyond the jurisdictional allegations in the complaint and consider whatever evidence has been submitted on the issue to determine whether subject-matter jurisdiction exists. *Id.* at 444. Additionally, in ruling on a 12(b)(1) motion based on such a challenge, the court need not presume that the plaintiff's allegations are true. *Id.* Even where the material facts are in dispute, the court must evaluate for itself the merits of the jurisdictional claims. *Id.*

The Federal Defendants and the IDOT Defendants base their arguments on causation and redressability, while the Tollway

Defendants additionally argue that Midwest has suffered no injury in fact.

## 1.   *Injury in Fact*

The Tollway argues that Midwest cannot show that it has suffered an injury in fact because it cannot show that its DBE program prevents Midwest from competing on equal footing.  The Tollway asserts that during the time frame alleged in the Complaint, the Tollway awarded 60 percent of its contracts to non-minority owned firms.  Midwest, the Tollway contends, was the contractor selected in more than one fifth of those contracts.  This shows that Midwest has benefitted from its procedures for letting contracts, regardless of the DBE program, the Tollway asserts.

The parties agree that in the context of set-aside programs, the Supreme Court has defined an injury in fact as the inability to compete on an equal footing in the bidding process.  *Ne. Fla. Gen. Contractors v. Jacksonville*, 508 U.S. 656, 666 (1993).  This means that a party must demonstrate that it is ready and able to bid on contracts, but a discriminatory policy prevents it from doing so on an equal basis.  *Id.*

In *Northeastern Florida General Contractors*, the plaintiff was an association of construction firms that challenged a Jacksonville ordinance that set aside a certain amount of the money spent on city contracts each year for minority owned business.  *Id.* at 659.

Plaintiff alleged that its members regularly bid on and performed construction work in the City of Jacksonville, and that they would have bid on certain set-aside contracts but for the ordinance. *Id.* The Court found plaintiff's allegation that its members were excluded from consideration for a certain portion of the municipal contracts at issue to be sufficient to state an injury. *Id.* at 667-68; *see Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995)(finding sufficient allegation of injury where plaintiff alleged it would, in the near future, bid on government contracts that offered financial incentives to prime contractors for hiring minority contractors).

The parties agree that in the context of set-aside programs, the Supreme Court has defined an injury in fact as the ability to compete on an equal footing in the bidding process. But the Tollway contends that Midwest's allegations of injury in fact are insufficient to meet the pleading requirements of *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009). Here, Midwest's Complaint alleges that it does not qualify as a DBE. Pl.'s Compl. ¶¶ 6, 137. It bids, primarily as a subcontractor, on contracts let by the Tollway. Pl.'s Compl. ¶ 131. Plaintiff further alleges that the Tollway's DBE program burdens non-DBE subcontractors, and that Midwest has suffered damages as a consequence of the program. Pl.'s Compl. ¶¶ 166-69, 185. The Court finds that Midwest's Complaint contains sufficient factual detail to fairly allege an

inability to compete on an equal footing in the bidding process.
*See Bissessur v. Ind. Univ. Bd. of Trs.*, 581 F.3d 599, 602 (7th
Cir. 2009) (holding that while bare legal conclusions do not
suffice to survive a dismissal motion, factual allegations need not
be detailed).

Additionally, the Court notes that Midwest has included as an
exhibit a list of subcontracts on Tollway projects in which its bid
was lower than that of a DBE that was awarded the subcontract.
Midwest has submitted an affidavit from its Secretary, Everett Bell
("Bell"), attesting that based on his experience Midwest would have
received at least half of those contracts as the low bidder in the
absence of the Tollway's DBE program.  This bolsters the Court's
conclusion that Midwest has asserted a plausible claim that it has
suffered an injury in fact.  Even if, as the Tollway contends, most
of its subcontracts went to non-minority owned firms, this does not
negate Midwest's allegations of an injury in fact.  Equally
unavailing is the Tollway's argument that Midwest has not
adequately alleged an injury because the prime contractors selected
by the Tollway had no obligation to choose Midwest even if it was
the lowest bidder and even in the absence of the DBE program.  The
fact remains that the inability to compete on equal footing for
even one contract would constitute an injury.  *See Coral Const. Co.
v. King Cnty.*, 941 F.2d 910, 930 (9th Cir. 1991) ("An injury

results not only when [the bidder] actually loses a bid, but every time the company simply places a bid.").

## 2. Causation and Redressability

The more difficult issue, and the one raised by all Defendants, is whether Midwest has met the causation and redressability requirements for standing. Essentially, Defendants' argument is that the economic disadvantage components of their DBE programs are severable from, and would survive any challenge to, the race- and sex- conscious elements. Because Midwest's annual revenues are greater than the DBE program allows for participation, Midwest could never be certified as a DBE even if the race- and sex-conscious provisions were removed, Defendants argue. As such, Midwest's injuries were not caused by the race- and sex-conscious provisions, and cannot be redressed by their invalidation, Defendants contend.

In order to qualify as a DBE, an enterprise must be a "small business," which is defined by the applicable regulations in regard to specialty trade contractors as one that has annual receipts no greater than $14 million. 49 C.F.R. § 26.65(a); 13 C.F.R. § 121.201. This regulation is based on the North American Industry Classification System ("NAICS") incorporated into the Small Business Act regulations. 13 C.F.R. § 121.201.

Midwest's annual receipts have ranged from $17.4 million to $25.3 million from fiscal year 2007 through fiscal year 2010,

seemingly too high to qualify it for the DBE programs. *See* State Resp. to Midwest Fence Mot. for TRO, Ex. A, Decl. of Mike Renner ¶ 7 (listing Midwest Fence's gross annual receipts). However, Midwest challenges its classification as a specialty trade contractor for determining the income cap, arguing that it could be considered a company involved in highway, street, and bridge construction under the NAICS classification system, and thus be subject to a higher cap. *Compare* sector 23, subsector 238 of the NAICS, 13 C.F.R. § 121.201, allowing annual receipts of up to $14 million, *with* subsector 237, allowing annual receipts of up to $33.5 million.

Midwest additionally notes that its gross income includes portions of the work it subcontracted. If that sum is subtracted from its annual receipts, Midwest contends, its income would not be too large to meet DBE status, even under the standard selected by Defendants. Midwest also contends that its estimated gross revenue for the fiscal year that ended on March 31, 2011, is about $12 million, below the threshold for other specialty contractors. Defendants argue that Midwest's objections to the income classifications cited by Defendants are red herrings because Midwest has not come forth with any evidence that it meets the definition of a socially and economically disadvantaged business, and so could qualify as a DBE.

Defendants rely on a number of cases to support their argument as to causation and redressability.  First, they point to Judge Rebecca Pallmeyer's ruling upholding the constitutionality of the DBE program under a predecessor statute to SAFETEA-LU, the Transportation Equity Act for the 21st Century, Pub. L. 105-178, 112 Stat. 107 (1998) ("TEA-21").  *N. Contracting, Inc. v. Ill.*, 00 C 4515, 2004 WL 422704 (N.D. Ill. Mar. 3, 2004)(*N. Contracting II*).  There, Judge Pallmeyer found that the plaintiff had standing to challenge the DBE program, but the allegations were somewhat different than the ones made by Midwest because the plaintiff's gross revenues were low enough to qualify it for the DBE program. Specifically, the plaintiff had gross annual revenues of $3 million, and it alleged that it would have won at least two contracts but for the DBE goals.  *Id.* at *2, *24.

In her ruling in *N. Contracting II*, Judge Pallmeyer noted that "no uniform picture emerges from the case law regarding standing doctrine in cases involving governmental race- or gender-based set-aside programs." *Id.* at *24.  This division stems from differences in interpretation of *Northeastern Florida General Contractors*, where the Supreme Court collapsed the requirements of standing. *Ne. Fla. Gen. Contractors*, 508 U.S. at 666.  Specifically, the Court found that causation and redressability flowed from the injury alleged, that is, the erection of a barrier that made it more difficult for members of one group to obtain a benefit than it

is for members of another group.  *Id.* at 666 n.5.  It follows, then, that the barrier is the cause of the injury and so a judicial decree removing it redresses the injury.  *Id.*

The nature of the program at issue in *Northeastern Florida General Contractors* is important.  There, the city had enacted a set-aside program where 10 percent of the money spent on city contracts each year had to be set aside for minority businesses. *Id.* at 658.  After the plaintiff filed suit, the city repealed that ordinance and enacted one that, instead of a 10 percent set-aside, had "participation goals" and alternative methods to achieve those goals.  *Id.*  One of the ways to achieve the goal, however, was a "sheltered market plan" that was essentially a set-aside.  *Id.*  The Court held that "in the context of a challenge to a set-aside program, the 'injury in fact' is the inability to compete on an equal footing in the bidding process, not the loss of a contract." *Id.*

A number of courts have followed *Northeastern Florida General Contractors* to find standing in cases challenging programs similar to the one at issue here.  *See*, *e.g.*, *Sherbrooke Turf, Inc. v. Minn. Dep't of Trans.*, 345 F.3d 964, 967–68 (8th Cir. 2003) (finding standing to challenge state federally assisted highway programs because subcontractors had bid on those programs in the past, would continue to do so in the future, and would suffer competitive harm when the contracts were awarded to DBEs); *Monterey*

*Mech. Co. v. Wilson*, 125 F.3d 702, 706-08 (9th Cir. 1997)(finding standing to challenge a state statute that required general contractors to subcontract a percentage of work to women or minorities); and *Contractors Ass'n of E. Pa. v. City of Phila.*, 6 F.3d 990, 995-96 (3d Cir. 1993)(holding similarly in a case challenging a city set-aside program).

The cases relied on by Defendants either implicitly or explicitly found the highway DBE program at issue here to be distinguishable because it is not a traditional set-aside program where the recipients of benefits are restricted to minorities and women. Here, the DBE program does not impose quotas, and recipients of federal funding are not disciplined for failing to hit the 10 percent mark, which is aspirational. 49 C.F.R. § 26.51. Defendants argue that with a traditional set-aside program, the causal link between the alleged injury and the allegations of discrimination is clear, but with the highway DBE program it is not, because the rebuttable presumption of disadvantage for women and minorities is severable from the remainder of the statute. A handful of courts have applied this reasoning to dismiss suits similar to the instant one.

For example, in *Cache Valley Electrical Co. v. Utah Department of Transportation*, 149 F.3d 1119, 1120 (10th Cir. 1998), an electrical subcontractor sought to enjoin a predecessor of the DBE program at issue here. The court found that the contractor had

adequately alleged an injury in fact because of its inability to compete on equal footing with businesses that were classified as DBEs. *Id.* at 1122. However, while the court assumed that plaintiff could establish that its injury was fairly traceable to the DBE program, it found it would be "pure speculation" to conclude that invalidating the racial and gender preferences in the DBE program would redress the plaintiff's injury. *Id.* at 1123.

The *Cache Valley* court found that the disputed preferences were severable from the remainder of the DBE program and the program would remain viable even in the absence of those preferences. *Id.* Further, because the plaintiff at the summary judgment stage had presented no evidence that elimination of the preferences would result in a reduction of the number of qualified DBEs, it could not meet the redressability requirement. *Id.* In *Cache Valley*, the Court found *Northeastern Florida General Contractors* distinguishable because "[w]hen . . . the set-aside is conditioned solely on race or gender, the definition of the injury as the inability to compete on equal footing makes it explicitly traceable to the disputed preference and the elimination of that preference must therefore address the injury." *Id.* at 1123 n.3. This is not so when the racial and gender preferences are severable, the court held. *Id.*

Defendants also cite two district court cases that relied on *Cache Valley*. In *Klaver Construction Co., Inc. v. Kansas*

*Department of Transp.*, 211 F.Supp.2d 1296, 1302 (D. Kan. 2002), the court found a highway contractor lacked standing to challenge state and federal DBE programs because both it and its affiliate had an annual revenue too high for it to qualify as a DBE.  The court concluded that it was this non-discriminatory criteria that put the contractor at a disadvantage. *Id.* at 1303.  Even if the rebuttable presumption of disadvantage for women and racial minorities were removed from the statute, the DBE program would still exist to promote small businesses, and the contractor still would not qualify for it. *Id.*  Finally, in *Interstate Traffic Control v. Beverage*, 101 F.Supp.2d 445, 453 (S.D. W. Va. 2000), the court held that absent fraud, the removal of the rebuttal presumption of disadvantage for women and racial minorities from the DBE program would not alter the number of participants in the program.  Because the plaintiff could not meet the economic disadvantage elements of the DBE program, its competitive position would not be helped by the removal of the presumptions. *Id.*

Midwest contends that *Northeastern Florida General Contractors* is controlling and that *Cache Valley*, and the courts that rely on it, erred in adopting a "but for" causation analysis that is too stringent under Supreme Court precedent.  It notes that in *University of California v. Bakke*, 438 U.S. 265, 281 n.14 (1978), the Court held that a medical student did not have to allege that he would have been admitted to the school in the absence of a

minority enrollment program. Rather, his injury was an inability to compete for all the open slots in the program. *Id.*

As a preliminary point, the Court notes that it has not found any cases in which the Seventh Circuit applied a severability test like the one used in *Cache Valley* in order to determine standing. *See N. Contracting II*, 2004 WL 422704, at *24. More importantly, the Court agrees with Midwest that the analysis of standing in *Cache Valley* and the cases following it is too stringent. Rather, the Court finds that the appropriate standard is found in *Northeastern Florida General Contractors*, and once an injury is properly alleged, as it is here, causation and redressability flow from that injury. *Ne. Fla. Gen. Contractors*, 508 U.S. at 666.

*Cache Valley* and those cases following it rely on the idea that the presumptions of disadvantage given to minorities and women are severable from the program as a whole and that the program would have just as much participation, if not more, if the presumptions were eliminated. This means, the reasoning goes, that companies that do not qualify as DBEs would have just as much competition even if the court were to strike the racial presumptions, so a court could never redress their injuries through a court ruling in their favor. The Court believes that this assumes too much, even if Defendants are correct that Midwest cannot meet the income requirements to be a DBE. First, even if the court were to strike down the presumptions of disadvantage

given to women and minorities, the program would still be race-conscious in that race is a consideration in determining social disadvantage.  49 C.F.R., pt. 26, App. E.  Thus, striking the presumptions of disadvantage would not necessarily make the DBE programs race-neutral.

Moreover, the argument put forth by Defendants gives too little consideration to the value of the racial presumptions in the DBE programs.  On the one hand, Defendants argue that a compelling interest supports the use of race-conscious provisions in their DBE program.  On the other hand, they argue, that, in effect, these provisions carry little weight because the program would have been adopted by Congress without them and would continue to be just as successful if they were struck down by a court.  These premises are incompatible.

In order to qualify for the presumption of social and economic disadvantage, an individual must sign an affidavit certifying that he or she is a female or member of a racial minority and has been "subjected to racial or ethnic prejudice or cultural bias within American society because of my identity as a member of the above circled group."  Pl.'s Consol. Resp. to Defs.' Motion to Dismiss on Standing, Ex. D, Uniform Certification Application.  The individual must also certify that he or she meets the income limitations for personal net worth, and that his or her ability to compete in the

free market has been impaired due to diminished capital and credit opportunities. *Id.*

Midwest argues that it is unreasonable to presume that every person who can truthfully sign this affidavit would be able to prove disadvantage by a preponderance of the evidence as required by the regulations. 49 C.F.R. § 26.61(d). Proof of social disadvantage requires a showing of: (1) "at least one objective distinguishing feature that has contributed to social disadvantage, such as race, ethnic origin, disability, long-term residence in an environment isolated from the mainstream of American society"; (2) "personal experiences of substantial and chronic social disadvantage in American society, not in other countries"; and (3) "negative impact on entry into or advancement in the business world because of disadvantage." 49 C.F.R. pt. 26, App. E. To prove economic disadvantage, persons must submit personal financial information and show that their ability to compete in the market "has been impaired due to diminished capital and credit opportunities as compared to others in the same or similar line of business who are not socially disadvantaged." *Id.* The Court agrees with Midwest that the DBE program's rebuttable presumptions of disadvantage are significant in that it is much easier for an individual to sign truthfully the certification that it would be to prove by a preponderance of the evidence that he or she has been

disadvantaged compared to others working in the construction industry.

The Seventh Circuit's ruling in *Milwaukee County Pavers Association v. Fielder*, 922 F.2d 419 (7th Cir. 1991) is instructive. There, an association of highway contractors challenged highway set-aside programs in Wisconsin. *Id.* at 421. The Wisconsin program utilized a rebuttable presumption of disadvantage like the one at issue here. *Id.* The Seventh Circuit held that "a racial presumption is a form of discrimination," so the state was required to show that the presumption was necessary to remedy past discrimination in order for it to be upheld. *Id.* at 421–22. The court further noted that although the presumption of social and economic disadvantage was rebuttable, "given the difficulty of establishing whether a particular individual is socially and economically disadvantaged, the availability of the presumption is likely to be decisive." *Id.* at 422. That the Seventh Circuit viewed the presumption as a "significant benefit" shows the importance of such measures. *Id.* As such, even if this Court were to view the presumptions as severable, it cannot agree with the *Cache Valley* analysis that is "pure speculation" to conclude that eliminating the presumptions would have no impact on the number of businesses qualifying for the DBE program. Because the Court believes the better analytic approach for resolving the standing question is found by applying the rule of *Northeastern*

*Florida General Contractors*, it finds that Midwest has standing to challenge the DBE programs at issue here.

## B. The Federal Defendants' Motion to Dismiss on Other Grounds

The Federal Defendants additionally argue that Midwest Fence has failed to state a claim upon which relief can be granted in Counts I and IV of its Complaint (seeking declaratory relief that the federal statute creating the program and its regulations are invalid) because the USDOT DBE program has consistently been held to be facially constitutional. *See W. States Paving Inc. v. Wash. State Dep't of Trans.*, 407 F.3d 983, 1002-03, (9th Cir. 2005); *Sherbrooke Turf*, 345 F.3d at 973; *Adarand Constructors, Inc. v. Slater* (*Adarand VII*), 228 F.3d 1147, 1187 (10th Cir. 2000). (The Federal Defendants do not contest the as-applied constitutional challenge to the regulations presented in Count II.)

In order to survive a FED. R. CIV. P. 12(b)(6) motion to dismiss for failure to state a claim, the complaint must give the defendant fair notice of the grounds upon which it rests. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1084 (7th Cir. 2008)(citing *EEOC v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007)). And it must plausibly suggest that the plaintiff has a right to relief, raising the possibility of relief above a "speculative level." *Id.* (internal citations omitted).

In order to bring a successful facial challenge to a statute, the challenger must show there is no set of circumstances under

which the law would be valid. *United States v. Salerno*, 481 U.S. 739, 745 (1987). This means that Midwest has the burden of establishing that there is "no set of circumstances" under which the USDOT DBE program is valid. *Id.* Frankly, given prior case law, the Court highly doubts Midwest's ability to do this. The question is whether a facial challenge can be resolved at this stage of the proceedings.

Although Midwest, as the party challenging the statute, has the ultimate burden of showing that SAFETEA-LU is unconstitutional, the government first has a burden to produce "a strong basis in evidence" supporting the legislature's decision to use race-conscious measures. *Rothe Dev. Corp. v. Dep't of Def.*, 545 F.3d 1023, 1036 (Fed. Cir. 2008) (quoting *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 500 (1989)). After that compelling interest is established, the court must determine whether the statute is narrowly tailored to meet that interest. *Rothe Dev. Corp.*, 545 F.3d at 1049.

In arguing that the USDOT DBE program is facially constitutional, the Federal Defendants rely on the district court's ruling in *N. Contracting II*, where the court upheld the constitutionality of the program against a similar challenge. *See* 2004 WL 422704, at *24-40 (finding the program was narrowly tailored to serve a compelling government interest). The plaintiff did not appeal that portion of the court's order. But the Seventh

Circuit did uphold the constitutionality of Illinois' DBE program. *N. Contracting Inc. v. Ill.*, 473 F.3d 715, 724 (7th Cir. 2007)(*N. Contracting IV*). In so ruling, the court held that as a state entity relying on a federally mandated program, IDOT was entitled to rely on the federal government's compelling interest in implementing a local DBE plan for highway contracting. *Id.* at 720. Additionally, it found that the IDOT's DBE program was narrowly tailored because it did not exceed its grant of authority under the federal program. *Id.* at 722.

### 1.  The Compelling Interest

In *N. Contracting II*, in upholding the constitutionality of the federal DBE program, the court relied in large part on evidence of discrimination documented in a 1996 report entitled *The Compelling Interest for Affirmative Action in Federal Procurement: A Preliminary Survey*, 61 Fed. Reg. 26,050 (May 23, 1996)(the "1996 Compelling Interest Report"). *See* 2004 WL 422704, at *27–34 (discussing the report and other evidence supporting a compelling interest).

The Federal Defendants contend the evidence supporting a compelling government interest has only grown since then. It notes that in enacting SAFETEA-LU in 2005, Congress concluded that there was a "continuing compelling need" for the program. H.R. Rep. No. 109-203, at 834 (2005). In so finding, Congress relied on the record compiled in passing TEA-21 in 1998 (the predecessor statute

upheld in *N. Contracting II* and the other cases cited by the Federal Defendants) and subsequent reports demonstrating the continuing need for the program. *Id.* The Federal Defendants argue that in the last four years, Congress has convened about forty hearings and received more than 70 disparity studies that demonstrate how the effects of discrimination hinder minority and women-owned companies' ability to compete for public contracts. They ask the Court to consider several of these studies, including an update to the 1996 Compelling Interest Report titled *Compelling Interest for Race- and Gender-Conscious Federal Contracting Programs: An Update to the May 23, 1996 Review of Barriers for Minority- and Women-Owned Businesses*. (2010 Compelling Interest Report). *See* D.E. 15, Ex. 1. The updated report includes summaries of congressional hearings and reports, reports from jurisdictions across the country, and disparity studies commissioned by state and local governments, including Illinois. The Federal Defendants ask the Court to take judicial notice of these documents. They contend this information shows that "there continues to be a strong basis in evidence of discrimination to support the compelling interest in continued remedial action through USDOT's DBE program."

Midwest argues that judicial notice of these reports is inappropriate and contends this Court is not bound by the prior authority in *N. Contracting II* and other cases. Midwest notes that

the DBE program has continued for seven years since summary judgment was granted to the Federal Defendants in *N. Contracting II*. Midwest argues that affirmative action programs are meant to be temporary, and it is time for a fresh look at the DBE program.

First, the Court finds that while it can take judicial notice of the existence of the reports submitted by the Federal Defendants, it cannot take judicial notice as to whether these documents show a compelling interest supporting the federal DBE legislation. See *Hennessy v. Penril DataComm Networks, Inc.*, 69 F.3d 1344, 1354-55 (7th Cir. 1995)("In order for a fact to be judicially noticed, indisputability is a prerequisite"); *United States v. S. Cal. Edison Co.*, 300 F.Supp.2d 964, 974 (E.D. Cal. 2004)("A court can only take judicial notice of the *existence* of . . . matters of the public record, but not of the *veracity* of the arguments and disputed facts contained therein.").

Although the Court must determine whether a compelling interest exists as a matter of law, Midwest is entitled to an opportunity to respond and challenge the findings in these reports even though SAFETEA-LU's predecessor statute was consistently upheld as constitutional. As such, dismissal on this ground is premature at this point in the case. *See N. Contracting v. Ill.*, No. 00 C 4515, 2001 WL 987730, at *2-3 (N.D. Ill. Aug. 28, 2001) ("*N. Contracting I*")(holding that plaintiff contractor was entitled

to chance to rebut government's evidence of a compelling interest supporting highway DBE statute).

### 2. Narrow Tailoring

Because the Court cannot determine the existence of a compelling interest at this stage of the case, it is premature to consider whether the federal program is narrowly tailored to meet that interest.

### C. The IDOT Defendants' Motion to Dismiss on Other Grounds

The IDOT Defendants additionally move to dismiss Counts I through VII on the ground that they are barred by sovereign immunity. As noted above, these counts are confusingly pled, but Midwest asserts that, of those counts, it seeks relief from IDOT only in counts V through VII. These counts seek: (V) a declaration that state statutes authorizing IDOT's DBE program for state-funded projects are unconstitutional; (VI) a declaration that IDOT has not followed the USDOT regulations; and (VII) a declaration that the IDOT DBE program is unconstitutional. The problem is that Midwest does not clearly identify from which IDOT defendant it seeks relief in these counts. IDOT is correct that, as a state agency, it is entitled to sovereign immunity as to Midwest's claims seeking declaratory relief. *Kroll v. Bd. of Trs. of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991). Therefore, to the extent these counts name IDOT, they are dismissed.

However, Midwest may sue for prospective declaratory and injunctive relief against a state official in his or her official capacity, in this case Hannig, to enjoin a violation of federal law. *Will v. Mich. Dep't. of State Police*, 491 U.S. 58, 71, n.10 (1989). To the extent Counts VI and VII seek relief on this basis, they may go forward. Additionally, Midwest may bring suit against the state official responsible for enforcing the state laws creating Illinois' DBE program, in this case Hannig, and seek a declaration that those laws are unconstitutional, which is what it seeks to do in Count V. As such, Counts V through VII are dismissed in regard to IDOT, but may go forward in regard to Hannig.

## D.  **The Tollway Defendants' Motion to Dismiss on Other Grounds**

First, the Tollway Defendants move to dismiss Count XIV under FED. R. CIV. P. 12(b)(6) for failure to state a claim for relief. In Count XIV, labeled *Ex parte Young*, Midwest seeks injunctive relief preventing the Tollway board members from implementing its DBE program. However, the *Ex parte Young* doctrine is an exception to Eleventh Amendment immunity that allows prospective relief of enjoining violations of federal law by state officials, not a substantive ground of relief. *Graham v. Ill.*, 07 C 7078, 2009 WL 1543821, at *5 (N.D. Ill. June 3, 2009)(citing *Kroll*, 934 F.2d at 907). Because the Seventh Circuit has held that the Tollway is not the state and does not enjoy Eleventh Amendment immunity, the *Ex*

*parte Young* doctrine is inapplicable and this count is dismissed. *Miller-Davis Co. v. Ill. State Toll Highway Auth.*, 567 F.2d 323, 330 (7th Cir. 1977). Midwest must replead this Count to make it clear upon what substantive ground it seeks relief, and is given thirty (30) days from the date of this order to replead the Count if it chooses to do so.

Similarly, the Tollway challenges Count XVI of Midwest's complaint, which is labeled "Monetary Damages — Waiver of Sovereign Immunity." The Count alleges that the Tollway has waived sovereign immunity (which it does not need to do, because it does not have such immunity in the first place) and contends that since March 16, 2006, Midwest has sustained damages in the amount of $1.854 million as a direct consequence of the Tollway's diversity program. The problem is that the count does not allege a legal theory under which Midwest seeks substantive relief. While Midwest claims in its response that it seeks monetary damages in this count under the Illinois Civil Rights Act that is the theory it brings forward in Count XVII. This Count is dismissed, with Midwest given thirty (30) days from the date of this order to replead the Count, if it chooses to do so, to allege the substantive basis under which it seeks relief.

Finally, the Tollway seeks to limit Midwest's monetary damages in Counts XVI and XVII to those that accrued within the two years prior to the date of the filing of the complaint (*i.e.*, from

September 3, 2008, to September 3, 2010).  At issue is under what theory Midwest is suing.  As noted, Count XVI is vaguely pleaded and asserts only that Midwest is entitled to monetary damages — dating back to 2006 — because the Tollway cannot claim sovereign immunity.  Count XVII is brought under the Illinois Civil Rights Act.

In its Memorandum in Support of its Motion to Dismiss, the Tollway speculated that Midwest was bringing its claim for monetary damages under 42 U.S.C. § 1983.  Midwest, in its Reply, contends it is not suing under § 1983, but rather under the Civil Rights Act of 1964, 42 U.S.C. §2000d, and 42 U.S.C. § 1981.  Midwest contends that the statute of limitations for these claims is five years, and that a continuing violation theory should apply to its claims.

When it is clear from a complaint that some claims are barred by the statute of limitations, they may be disposed of on a motion to dismiss.  *Baker v. F&F Inv.*, 420 F.2d 1191, 1198 (7th Cir. 1970).  Because Midwest must replead Count XVI, the Court will not address the applicability of a statute of limitations at this time to this Count at this time.  However, the Court finds it necessary to make two points.  First, it is unclear whether Midwest is disclaiming any reliance on 42 U.S.C. § 1983, or only reliance upon it in regard to the Tollway Defendants.  The Court agrees with the Tollway Defendants that such a position would be odd because the gravamen of Midwest's Complaint is that the Defendants' DBE

programs violate the Fourteenth Amendment. *See Croson*, 488 U.S. at 469-70 (invalidating minority set-aside program under §1983 as violative of the Fourteenth Amendment's Equal Protection Clause). Further, § 1981 actions have a four-year statute of limitations, not a five-year limit as argued by Midwest. *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 371-72 (2004).

In regard to Count XVII, this claim for monetary relief is brought under the Illinois Civil Rights Act, which provides a remedy when state, county, or local governments discriminate on the basis of race. 740 ILCS 23/5(a). That statute explicitly provides that suit "must be brought not later than two years after the violation." 740 ILCS 23/5(b). Illinois applies a "discovery rule," which means that the statute begins to run when the party seeking relief "knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused." *Parks v. Kownacki*, 737 N.E.2d 287, 294 (Ill. 2000) (quoting *Knox Coll. v. Celotex Corp.*, 430 N.E.2d 976, 980 (Ill. 1981)).

Midwest does not dispute the applicability of the two-year statute of limitations for its cause of action under the Illinois Civil Rights Act, but contends that the "continuing violation doctrine" applies so that it may recover for all of its alleged losses dating back to March 2006. Essentially, Midwest's argument is that it could not have been expected to sue for every violation,

and it could not have known at the inception of the Tollway's program that it was suffering discrimination.

Under Illinois law, the "continuing violation doctrine" applies when violations of the law are so "continuous and unbroken . . . as to constitute one continuing wrong." *Davis v. Wells Fargo Bank*, No. 07 C 2881, 2008 WL 1775481, at *3 (N.D. Ill. Apr. 28, 2008)(quoting *Belleville Toyota, Inc. v. Toyota Motor Sales*, 770 N.E.2d 177, 191-93 (Ill. 2002)). Here, the Court finds it premature to decide this issue without a more complete factual record because the applicability of the doctrine is uncertain. *See Drees v. Cnty. of Suffolk*, No. 06 CV 3298, 2007 WL 1875623, at *9 (E.D.N.Y. 2007)(holding that dismissal is appropriate only if complaint clearly shows statute has run). As such, the Tollway's motion to limit Midwest's damages in Count XVI and XVII to a two-year period prior to the filing of this Complaint is denied at this time.

## III.  CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.  Defendants' Motion to Dismiss for lack of standing is denied;

2.  The Federal Defendants' Motion to Dismiss Counts I and IV as a matter of law is denied;

3.    Midwest voluntarily dismisses any claims for relief against the Federal Defendants sought pursuant to 42 U.S.C. § 1981 and 42 U.S.C. § 2000d;

4.    The IDOT Defendants' Motion to Dismiss Counts V through VII is granted with prejudice as to the IDOT itself, but denied as to Hannig; and

5.    The Tollway Defendants' Motion to Dismiss Counts XIV and XVI is granted, with Midwest given leave to replead within thirty (30) days from the date of this Order.

**IT IS SO ORDERED.**

_____
Harry D. Leinenweber, Judge
United States District Court

**DATE:** 6/27/2011