# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **MIDWEST FENCE CORPORATION,**<br><br>               **Plaintiff,**<br><br>      **v.**<br><br>**THE UNITED STATES DEPARTMENT OF TRANSPORTATION,** *et al.*,<br><br>               **Defendants.** | **Case No. 10 C 5627**<br><br>**Hon. Harry D. Leinenweber** |

## MEMORANDUM OPINION AND ORDER

Before this Court is Plaintiff Midwest Fence Corporation's ("Midwest") Motion to Exclude the Opinions of Jon Wainwright [ECF No. 280]. For the reasons stated herein, the Motion is denied.

## I. FACTUAL BACKGROUND

Midwest, a guardrail and fencing contractor owned entirely by white males, brings this action challenging government programs instituted to increase the flow of public dollars for road construction to companies owned by minorities or women that qualify as "disadvantaged business enterprises" (hereinafter, "DBEs" or "M/W/DBEs"). Expert discovery is underway regarding liability, including the question of whether Defendants have a strong basis to implement the race-conscious aspects of their DBE programs.

Two sets of Defendants, the "Federal Defendants" and the "Tollway Defendants," both disclosed Dr. Jon Wainwright as their liability expert. In serving that role, Dr. Wainwright submitted

a separate expert report on behalf of each group of Defendants. Dr. Wainwright, an economist, is the Senior Vice President of National Economic Research Associates ("NERA") with experience in performing disparity studies. Indeed, he was the primary author of disparity studies performed in 2004 and 2006 for some of the Tollway Defendants. These studies examine statistical evidence of DBE participation in public sector and private sector contracting and procurement activity, DBE representation in the relevant business population, and seek to explain the disparities observed between those factors.

According to Dr. Wainwright, there are four key elements to a disparity study: (1) determining the appropriate product market and geographic market area; (2) developing availability and utilization estimates and estimating public entity contracting disparities; (3) estimating economy-wide disparities; and (4) collecting anecdotal evidence in order to check for consistency with statistical findings. Pl.'s Mem. in Support of Excluding J. Wainwright ("Pl.'s Mem.") Ex. A at 4.

For as much paper as the parties have filed on the subject, the actual issue before the Court is rather narrow. The focus of Midwest's Motion is on the second element, specifically Dr. Wainwright's definition of "availability," and the impact that definition has on disparity. Midwest claims that those definitions are not only inconsistent with their normal meaning, but that they

are contrary to the directives of the Supreme Court as to the appropriate measures of availability and disparity.

Dr. Wainwright defines availability as "a statistic expressing the percentage of businesses in a relevant geographic and product market that are owned by minorities or women." *Id.* at 5. There are various methods to estimate availability. Dr. Wainwright favors a "custom census" designed to provide an accurate calculation of the current availability of DBEs in the relevant market. *Id.* The custom census analysis employs a seven-step approach that: (1) creates a database of representative public contracts; (2) identifies the appropriate geographic market for the entity's contracting activity; (3) identifies the appropriate product market for the entity's contracting activity; (4) counts all businesses in those relevant markets; (5) identifies listed minority-owned and women-owned businesses; (6) verifies the ownership status of listed minority-owned and women owned businesses; and (7) verifies the ownership status of all other businesses. *Id.* at 5-6.

After determining DBE availability, Dr. Wainwright estimates DBE utilization, which shows the fraction of public contracting and procurement dollars in a particular market that are spent with DBEs. Calculating both DBE utilization and availability is crucial. Indeed, as Dr. Wainwright explains, "[a] disparity

analysis of agency spending is simply a comparison of M/W/DBE utilization to M/W/DBE availability." *Id.* at 8.

Midwest takes issue with Dr. Wainwright's method of estimating DBE availability. Key to the disagreement is a statement in one of Dr. Wainwright's reports in which he states "NERA's measure of M/W/DBE availability is, by design, independent of factors, such as 'readiness, willingness, and ability' or 'capacity' that are themselves most likely to be adversely impacted by the presence of business discrimination." *Id.* at 7. Midwest argues that this statement renders Dr. Wainwright's methodology contrary to both Supreme Court precedent and federal regulations, and as such, his opinions should be excluded.

## II. LEGAL STANDARD

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny. *See, Ervin v. Johnson & Johnson, Inc.,* 492 F.3d 901, 904 (7th Cir. 2007). Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise." FED. R. EVID. 702. The Seventh Circuit has developed a three-part analysis for determining the admissibility of expert testimony under Rule 702

and *Daubert.* *See, Ervin,* 492 F.3d at 904. First, "the witness must be qualified 'as an expert by knowledge, skill, experience, training or education.'" *Id.* (quoting FED. R. EVID. 702.) Second, "the expert's reasoning or methodology underlying the testimony must be scientifically reliable." *Id.* (citing *Daubert,* 509 U.S. at 592-93. Finally, the expert's testimony must be relevant, or "assist the trier of fact to understand the evidence or to determine a fact in issue." *Ervin,* 492 F.3d at 904.

Whether to admit expert testimony rests within the discretion of the district court. *Nunez v. BNSF Ry. Co.,* No. 09-4037, 2012 U.S. Dist. LEXIS 97411 at *11 (C.D. Ill. July 13, 2012). A federal judge has the responsibility of being a "gatekeeper" regarding the expert evidence presented to the trier of fact. *Daubert,* 509 U.S. at 589, 597. A district court has "wide latitude in performing its gate keeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Bielskis v. Louisville Ladder, Inc.,* 663 F.3d 887, 893 (7th Cir. 2011).

### III. ANALYSIS

Midwest does not appear to challenge Dr. Wainwright's qualifications, so the Court need not discuss them at length. Suffice it to say, the Court finds Dr. Wainwright to be qualified to serve as an expert in the matters relevant to this Motion. Midwest's problem lies with Dr. Wainwright's methodology.

## A. "Ready, Willing and Able" DBEs

While Midwest makes several other arguments, the heart of this dispute lies in the determination of "available" DBEs for purposes of these assistance programs. Midwest's argument is that Dr. Wainwright estimates availability improperly by not considering which DBEs are "ready, willing and able" to perform contracts at issue. Put another way, Midwest argues that Dr. Wainwright's opinion is based on assumptions that render it insufficient as a matter of law to justify the DBE programs.

Plaintiff's argument is premised heavily on both a Supreme Court decision and federal regulations. In *Richmond v. J.A. Croson Co.,* 488 U.S. 469 (1989), the Supreme Court was asked to evaluate the constitutionality of a race-based program similar to the one at issue here. On the subject of the type of evidence needed to justify such a program, Justice Sandra Day O'Connor, writing on behalf of four of the Justices, explained that when a city has evidence before it that nonminority contractors were excluding minority businesses systematically from subcontracting opportunities, it could take action to end the discriminatory exclusion. *Id.* at 509. She explained:

> Where there is a significant statistical disparity between the number of **qualified minority contractors willing and able to perform** a particular service and the number of such contractors actually engaged by the locality or the locality's prime contractors, an inference of discriminatory exclusion could arise. Under such circumstances, the city

> could act to dismantle the closed business system by taking appropriate measures against those who discriminate on the basis of race or other illegitimate criteria. In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.

*Id.* at 509 (citations omitted, emphasis added). This notion that the minority contractors be willing and able is also found in the federal regulations that govern the participation of DBEs in Department of Transportation financial assistance programs. Indeed, 49 CFR § 26.45, the regulation setting forth the process by which an entity receiving government assistance must set an overall goal for DBE participation, states:

> Your overall goal must be based on demonstrable evidence of the **availability of ready, willing and able DBEs** relative to **all businesses ready, willing and able** to participate on your DOT-assisted contracts (hereafter, the "relative availability of DBEs"). The goal must reflect your determination of the level of DBE participation you would expect absent the effects of discrimination. You cannot simply rely on either the 10 percent national goal, your previous overall goal or past DBE participation rates in your program without reference to the relative availability of DBEs in your market.

49 CFR § 26.45(b) (emphasis added). Midwest asserts that Dr. Wainwright's acknowledgment that NERA's measure of availability is, "by design, independent of factors, such as 'readiness, willingness, and ability' or 'capacity' that are themselves most likely to be adversely impacted by the presence of business

- 7 -

discrimination," are fatal to his opinions, since that methodology does not follow the requirements of *Croson* and the federal regulations. *See,* Pl.'s Mem. Ex. A at 7.

The Defendants each set forth several arguments in defense of Dr. Wainwright's reports. The Federal Defendants first stress Dr. Wainwright's expertise, which Midwest does not challenge in this motion. Then they note that *Croson* does not define "willing and able," and in any event Midwest's arguments are legal in nature and more appropriate for summary judgment. They also note that the methodology employed in the NERA studies included in the expert reports have been accepted as valid in numerous courts. *See, e.g., Northern Contracting, Inc. v. Illinois,* 473 F.3d 715, 718 (7th Cir. 2007); *Concrete Works of Colo., Inc. v. City and County of Denver,* 321 F.3d 950, 966 (10th Cir. 2003) (describing NERA availability methodology as "sophisticated"). The Federal Defendants claim that Midwest's attacks on the definition of "willing and able" are at best appropriate for cross-examination or a rebuttal expert report, but not exclusion.

The Tollway Defendants focus their response on the fact that the Seventh Circuit already examined a study drafted by the same author and using the same methodology for calculating DBE availability. In *Northern Contracting,* the court examined a NERA disparity and availability study commissioned by IDOT and authored by Dr. Wainwright. *Northern Contracting,* 473 F.3d at 718. IDOT

retained Dr. Wainwright as an expert to defend that study in the litigation, and he explained that he used a "custom census" methodology in that study, as well. *Id.* The plaintiff in that action claimed that IDOT miscalculated the number of DBEs that were "ready, willing and able" under 49 C.F.R. § 26.45(b) by using the NERA custom census instead of a simple count of the number of registered and prequalified DBEs under Illinois law. *Id.* at 723. The Seventh Circuit, however, found that there was "nothing in the federal regulations indicating that a recipient must so narrowly define the scope of ready, willing, and available firms." *Id.* The Court noted that the NERA approach was an attempt to arrive at more accurate numbers, and that the approach was the same one that had been used by the Minnesota Department of Transportation in the unsuccessful challenge to its program. *Northern Contracting,* 473 F.3d at 723 (citing *Sherbrooke Turf Inc. v. Minn. Dept. of Trans.,* 345 F.3d 964, 973 (8th Cir. 2003)). The court agreed with the district court that "the remedial nature of the federal scheme militates in favor of a method of DBE availability calculation that casts a broader net." *Id.* As such, it approved of Dr. Wainwright's methodology. *Id.*

Midwest's argument has some merit when one simply compares Dr. Wainwright's offending statement to the language highlighted by Midwest from *Croson* and the regulation. However, a closer look at those sources, as well as Dr. Wainwright's reports, reveals that

the issue is not as straightforward as Midwest would have it appear.

First, Midwest relies heavily upon the language cited above from *Croson*, claiming that it is "controlling," *see,* Reply at 7, and that:

> the Supreme Court has held that, for statistics to be relied upon to make a particularized finding of discrimination by a governmental unit, they must minimally demonstrate a statistically significant disparity in the utilization by the government unit of those DBEs who are 'ready, willing and able' to perform the work involved.

Pl.'s Mem. at 13. As such, Midwest claims that Dr. Wainwright's quarrel is with the Supreme Court.

That is not quite accurate, though. As Judge James Moran noted, reviewing the present state of the law respecting affirmative action programs in public contracting is "no simple task. 'The Supreme Court's declarations in the affirmative action area are characterized by plurality and split opinions and by the overruling of precedent.'" *Builders Ass'n of Greater Chi. v. City of Chi.,* 240 F.Supp.2d 796, 797 (N.D. Ill. 2002). Indeed, the language from *Croson* that Midwest quotes repeatedly came not from the majority opinion, but from a portion of the decision that had the support of only four Justices. As one of our sister courts explained under similar circumstances, it is necessary to examine what the *Croson* plurality actually decided.

In *North Shore Concrete and Assoc., Inc. v. The City of New York, et al.,* 94 cv 4017, 1998 U.S. Dist. LEXIS 6785 at *28 (E.D.N.Y. Apr. 12, 1998), the plaintiff challenged a New York City program enacted to set goals for minority and women owned business enterprise ("M/WBE") participation in City construction contracts. *Id.* at *1. The plaintiff moved for summary judgment, and in doing so, challenged a study that NERA performed for the City of New York. *Id.* at *19. The plaintiff challenged the NERA report in that case on the same grounds as Midwest does here, arguing "that when deciding which M/WBEs were qualified when calculating availability, NERA did not take into account any relevant criteria, such as willingness or ability of firms to perform the services required by City contracts." *Id.* at *23. Relying on *Croson,* the plaintiff claimed that since NERA considered all M/WBE construction firms with at least one employee other than the owner to be qualified to do any type of construction work, this overstated the number of qualified M/WBEs, and that a more appropriate measure of "available firms" should be used. *North Shore Concrete,* 1998 U.S. Dist. LEXIS 6785 at *23. NERA explained that it made the conscious decision to tailor its analysis to the relevant industry and geographic area (and included only firms with paid employees) without considering any additional qualifications because of: (1) the relative unavailability of data sources on firm qualification; (2) the lack of definitive standards as to what qualifications were

necessary; and (3) a determination that qualifications of M/WBE firms were likely to have been adversely affected by specific discrimination. *Id.* at *24.

The court found that it was a question of fact, not law, as to whether or not the methodology of the NERA study was such that it calculated the number of qualified M/WBEs fairly. *Id.* at *27. In addressing the plaintiff's *Croson*-based arguments, the Court explained:

> [I]t is important to remember what the *Croson* plurality opinion did and did not decide. The Richmond program, which the *Croson* Court struck down, was insufficient because it was based on a comparison of the minority population in its entirety in Richmond, Virginia (50%) with the number of contracts awarded to minority businesses (.67%). There were no statistics presented regarding the number of minority-owned contractors in the Richmond area, and the Supreme Court was concerned with the gross generality of the statistics used in justifying the Richmond program. There is no indication that the statistical analysis performed by NERA in the present case, which does contain statistics regarding minority contractors in New York City, is not sufficient as a matter of law under *Croson*. Indeed, *Croson* made only broad pronouncements concerning the findings necessary to support a state's affirmative action plan and generally provided that the plan has to be narrowly tailored, but left the validity of particular plans to be assessed on a case-by-case basis.

*Id.* at *28-29 (internal citations omitted).

The *North Shore Concrete* court went on to note that various circuit courts had read *Croson* similarly, finding that it

"impliedly . . . permit[s] a municipality to rely . . . on general data reflecting the number of MBEs and WBEs in the marketplace to defeat the challenger's summary judgment motion or request for a preliminary injunction." *Id.* (quoting *Concrete Works,* 36 F.3d at 1528). The court acknowledged that while the plaintiff had raised uncertainty regarding the accuracy of the NERA study in that NERA's reliance on the percentage of M/WBEs available in the marketplace might overstate the number of M/WBEs "willing and able" to take a public contract, that issue could not be decided on a motion for summary judgment. *Id.* at *31.

The Court understands that the context of summary judgment is a bit different of a posture than a *Daubert* motion. But the *North Shore Concrete* court's discussion of *Croson,* in the face of a NERA report alleged to suffer from the same deficiency as Dr. Wainwright's reports in this case, is instructive and compelling. The *Croson* plurality gave no definition of what constituted "willing and able," and more importantly left open the possibility of an analysis, such as the one in *North Shore Concrete,* based on more general statistics regarding DBEs in the marketplace. It is simply not evident that Dr. Wainwright's favored methodology runs afoul of the *Croson* plurality, and, indeed, appears consistent with it.

Midwest encounters a similar problem with its reliance on 49 C.F.R. § 26.45(b). It is true, as Midwest points out, that the

regulation states "[y]our overall goal must be based on demonstrable evidence of the availability of ready, willing and able DBEs relative to all businesses ready, willing and able to participate on your DOT-assisted contracts. . . ." *Id.* But that does not end the regulation's discussion on the topic. Per the regulation, the goal setting process begins by determining a base figure for the relative availability of DBEs. § 26.45(c). The regulation does not define what constitutes "ready, willing and able," but instead provides five different examples of approaches that can be taken to determine a base figure. *Id.* The regulation makes it clear that "[t]hese examples are not intended as an exhaustive list. Other methods or combinations of methods to determine a base figure may be used. . . ." *Id.* These alternatives range from using a bidders list to using data from a disparity study. *Id.* The regulation notes that other methods may be used to determine a base figure as long they are based on demonstrable evidence of local conditions and are designed to attain a goal that is related rationally to the relative availability of DBEs in the market. § 26.45(c)(5). The regulation then provides for the adjustment of the availability figure, and notes that there "are many types of evidence that must be considered when adjusting the base figure." § 26.45(d)(1). Also, the study "must consider" evidence from related fields that affect the opportunities for DBEs to form, grow and compete, such as

statistical disparities in the ability of DBEs to get financing, bonding and insurance. § 26.45(d)(2).

Needless to say, under the regulation the process of determining the available DBEs is not a static, defined process. There is an inherent flexibility that allows for different methodologies and considerations to be used in setting the ultimate goal for DBE participation, and in particular determining the availability of "ready, willing and able" DBEs. Dr. Wainwright's reports show he operates within this framework.

First, as stated previously, the "custom census" methodology he prefers has already been acknowledged as valid under the regulation by our Circuit Court in a decision that came down two decades after *Croson*. *See, Northern Contracting,* 473 F.3d at 723. Second, it is not true that Dr. Wainwright ignores issues of readiness, willingness and ability. Indeed, it is clear he considers those issues at great length. He spends a section of his report explaining why, in his experience, measures of such factors (such as firm revenues, employment size, and bonding limits) are all likely to be influenced by the presence of discrimination in the relevant markets. Pl.'s Mot. Ex. A. at 7. Working such metrics into the measure of availability risks considering factors that themselves are affected by discrimination, therefore making availability figures artificially low. As such, he chose to measure availability independent of those factors that are

themselves most likely to be adversely impacted by the presence of business discrimination. He then devotes pages of his report to explaining the effects of discrimination on such factors, and his support for those conclusions.

The Court thus does not view Dr. Wainwright's approach as violating the *Croson* plurality position relied upon by Midwest. It also views his decision to apply his methodology independent of indicators that might otherwise be used to show "readiness, willingness or ability" due to concerns of discriminatory taint to be within the regulation's framework for allowing adjustments to the availability. Indeed, the regulation demands such consideration. *See,* § 26.45(d)(2). Other courts have found that reliance on general data reflecting the number of DBEs in the marketplace to be sufficient. *See, North Shore Concrete,* 1998 U.S. Dist. LEXIS 6785 at *30 (listing cases). Here, Dr. Wainwright advocates a methodology endorsed by other courts, and which this Court concludes is reliable. While Midwest has raised questions about whether Dr. Wainwright's methodology overstates the number of "willing and able" DBEs, it will have an opportunity to attack the accuracy and credibility of that methodology at trial.

### B. Dr. Wainwright Is Not Just a "Mouthpiece" for Others, Nor Are His Reliance Materials "Too Voluminous" or Arguments "Circular"

Midwest next complains that Dr. Wainwright's reliance materials, which include ninety-five disparity studies totaling

approximately 63,000 pages, are too voluminous, and that he cannot serve as a mouthpiece for other experts' hearsay opinions. Midwest notes that while twenty-one of the studies were conducted under Dr. Wainwright's direction and supervision, the others were created for other State governments and municipalities. Midwest relies on *Erickson v. Baxter Healthcare, Inc.,* 131 F.Supp.2d 995 (N.D. Ill. 2001), to support the notion that they are too voluminous. That court, when examining a bibliography attached to an expert report, stated:

> The nineteen articles listed in Dr. Volderding's bibliography **may provide a reliable basis for his opinion**; for that matter, so might the 159 original articles, twenty-nine reviews, editorials and letters, thirty-seven books, book chapters and monographs, or sixty-seven abstracts listed in his vitae. But the defendants cannot seriously expect Ms. Ericson to wade through 311 scientific texts **without any references to specific pages to support the opinion in question**.

*Id.* at 1000-01 (emphasis added). This language defeats Midwest's argument, however, as it is clear that Dr. Wainwright did provide specific pages in the cited materials that support his opinions. *See,* ECF No. 281-1 Ex. A at Table 4. The Court does not consider these studies to be too voluminous, particularly when Dr. Wainwright identified the relevant pages.

Midwest also claims that the records are inadmissible hearsay, and that Dr. Wainwright cannot serve as a "mouthpiece" for non-testifying individuals. *See, In re Sulfuric Acid Antitrust Litig.,*

446 F.Supp.2d 910 (N.D. Ill. 2006) ("[I]t must be determined whether the disclosed expert is genuinely formulating an opinion based in part on the underlying data or whether he is acting as the 'mouthpiece' for the non-testifying individual on whose data he is relying."). Of course, the fact that such records are hearsay does not mean that Dr. Wainwright is forbidden from considering them in forming an opinion. On the contrary, it is well established that an expert may rely on hearsay in forming an opinion if it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *City of Chicago v. Westchester Fire Ins. Co.,* No. 08 C 5535, 2010 U.S. Dist. LEXIS 90490 at *19 (N.D. Ill. Sept. 1, 2010) (quoting FED. R. EVID. 703). There is no indication that these studies are not of a type relied upon reasonably in the field, and indeed, such disparity studies appear to be common and crucial in forming opinions as to the appropriateness of these types of programs.

Finally, Midwest argues that Dr. Wainwright's methodology is circular, because it begins with an assumption that discrimination has held back DBEs in road construction which he uses ultimately to show discrimination. Midwest's rationale oversimplifies Dr. Wainwright's methodology. As explained earlier, Dr. Wainwright uses a methodology previously approved by courts, including the Seventh Circuit. Part of this methodology involves the evaluation of whether various factors often used to measure availability were

tainted by discrimination, a consideration the regulation contemplates explicitly. He concludes that they had, and thus believes the rest of an availability analysis should be performed independent of them. The Court does not find that process circular.

In sum, the Court does not find that Midwest's complaints regarding the volume of Dr. Wainwright's supporting materials, potential inadmissibility of those materials, or the procession of his analysis to warrant striking his opinions.

## IV. CONCLUSION

The Court finds that Dr. Wainwright is qualified, that his preferred methodology is scientifically reliable, and that his opinions may be helpful to the trier of fact in understanding the issues of this case. For the reasons stated herein, Midwest's Motion to Exclude Opinions of Jon Wainwright [ECF No. 280] is denied.

**IT IS SO ORDERED.**

                                                Harry D. Leinenweber, Judge
                                                United States District Court

Date:1/28/2014