IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MIDWEST FENCE CORP.,

                    **Plaintiff,**

        **v.**

**UNITED STATES DEPARTMENT OF
TRANSPORTATION,** *et al.,*

                **Defendants.**

**Case No. 10 C 5627**

**Judge Harry D. Leinenweber**

## MEMORANDUM OPINION AND ORDER

Before the Court is a constitutional challenge to federal and state programs designed to benefit disadvantaged business entities ("DBEs") in the highway construction industry. Plaintiff Midwest Fence (hereinafter, "Plaintiff" or "Midwest"), a non-DBE fencing and guardrail contractor that is owned and controlled by white males, alleges that the DBE programs instituted by the United States Department of Transportation ("USDOT"), the Illinois Department of Transportation ("IDOT"), and the Illinois State Tollway Highway Authority (the "Tollway") violate its right to equal protection under the law.

Plaintiff's lawsuit targets three groups of Defendants: (1) USDOT, the United States Secretary of Transportation, and the Administrator of the Federal Highway Administration ("FHWA")

(hereinafter, collectively, the "Federal Defendants"); (2) IDOT and the Illinois Secretary of Transportation (hereinafter, collectively, the "IDOT Defendants" or "IDOT"), and (3) the Tollway and its eleven-member board, which is headed by chairwoman Paula Wolff and also includes the Governor of Illinois and the Illinois Secretary of Transportation, who serve as *ex officio* board members (hereinafter, collectively, the "Tollway Defendants" or the "Tollway"). Plaintiff has named all individuals in their official capacity.

Plaintiff and all three groups of Defendants have cross-moved for summary judgment. For the reasons stated herein, the Court grants the Federal Defendants', IDOT Defendants', and Tollway Defendants' Motions for Summary Judgment [ECF Nos. 369, 366, 378]. Midwest's Motion for Summary Judgment [ECF No. 372] is denied.

## I. BACKGROUND

The Court has compiled the following factual record through thorough study of the parties' briefs, Local Rule 56.1 Statements of Material Facts, and supporting evidentiary materials. The Court takes judicial notice that certain public officials have changed during the course of this litigation.

### A. The Parties

Midwest is a fencing and guardrail contractor incorporated in Delaware, with its principal place of business in Chicago,

Illinois. White males own and control Midwest. Midwest is not a DBE under any of the DBE programs challenged in this lawsuit. From 2006-2010, Midwest generated average gross sales of approximately $18 million per year.

USDOT is an executive department of the federal government, headed by the United States Secretary of Transportation. At the time the operative Complaint was filed in this action (the "Complaint," ECF No. 217), Ray LaHood served as Secretary of Transportation. Anthony Foxx now fills this role. The FHWA is an agency within USDOT, headed by the FHWA Administrator. At the time of the Complaint, Victor Mendez served as FHWA Administrator. Gregory Nadeau now serves as Acting FHWA Administrator. The FHWA is charged with the design, construction, and maintenance of the nation's highways.

IDOT is an executive department of the Illinois government, headed by the Illinois Secretary of Transportation. At the time of the Complaint, Ann Schneider served as Acting Secretary of IDOT, having just replaced Gary Hannig. Erica Borggren later replaced Schneider. Randall Blankenhorn now serves as Acting Secretary of IDOT. IDOT is charged with the planning, construction, and maintenance of the state's transportation network. IDOT receives both federal and state funding to accomplish its goals. For administrative purposes, IDOT divides the state of Illinois into nine districts.

The Tollway is an instrumentality and administrative agency of the state of Illinois, governed by an eleven-member board of directors, which includes the Governor of Illinois and the Secretary of IDOT. At the time of the Complaint, Pat Quinn served as Governor of Illinois and Schneider served as Acting Secretary of IDOT. At present, Bruce Rauner serves as Governor of Illinois and Blankenhorn serves as Acting Secretary of IDOT. The Tollway is authorized to construct, operate, regulate, and maintain Illinois' system of toll highways. The Tollway does not receive any federal funding to accomplish its goals.

### B. The Challenged DBE Programs

The Federal, IDOT, and Tollway Defendants have instituted programs intended to increase the flow of public road construction dollars to contractors who qualify as DBEs. The federal DBE program (the "Federal Program") sets an aspirational goal that USDOT expend at least 10% of its funds through DBEs. As a condition of receiving federal transportation funds, IDOT is required to implement the Federal Program in Illinois pursuant to the regulations contained in 49 C.F.R. pt. 26 (the "Federal Regulations" or the "Regulations"). Although the Regulations do not require IDOT to implement the Federal Program on its state-funded projects, IDOT voluntarily does so. IDOT has also implemented a Target Market Program under which it may take additional measures "to remedy particular incidents and

- 4 -

patterns of egregious race or gender discrimination" in certain districts. 20 ILCS 2705/2705-600. The Tollway voluntarily implements its own DBE program, which mirrors the Federal Program in many respects. The following sections describe the mechanics of each DBE program.

### 1. *The Federal Program*

Under the Federal Program, which was first enacted in 1982, USDOT is to expend no less than 10% of authorized funds through DBEs — "small business concerns owned and controlled by socially and economically disadvantaged individuals." Moving Ahead for Progress in the 21st Century Act ("MAP-21"), Pub. L. No. 112-141, § 1101(b), 126 Stat. 405 (2012). The 10% goal is set at the national level and is aspirational. 49 C.F.R. § 26.41. Congress has reauthorized the Federal Program on numerous occasions, most recently in 2012 under MAP-21. In determining whether reauthorization was appropriate, Congress reviewed statistical evidence, testimony, reports, and other evidence. Based on this material, Congress concluded that "discrimination and related barriers continue to pose significant obstacles for minority- and women-owned businesses seeking to do business in federally-assisted surface transportation markets across the United States." Pub. L. No. 112-141 § 1101(b).

The Federal Regulations, along with the Small Business Act, 15 U.S.C. § 631 *et seq.,* break down the definition of a DBE.

First, a DBE must be a "small business concern" that falls within the size standards published by the Small Business Administration ("SBA"). 49 C.F.R. § 26.65; 13 C.F.R. § 121.201. Second, a DBE cannot have average annual gross receipts in excess of $23.98 million over the past three fiscal years. 49 C.F.R. § 26.65. Third, a DBE must be at least 51% owned, managed, and controlled "by one or more socially and economically disadvantaged individuals." 15 U.S.C. § 637(d)(3)(C).

Socially disadvantaged individuals are persons "who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(a)(5). "Economically disadvantaged individuals" are a subset of socially disadvantaged individuals whose ability to compete in the marketplace has been diminished by capital and credit opportunities that are poor in comparison to those afforded to persons who are not socially disadvantaged. *Id.* § 637(a)(6)(A). There is a rebuttable presumption that certain groups — "women, Black Americans, Hispanic Americans, Native Americans, Asian-Pacific Americans, Subcontinent Asian Americans, or other minorities found to be disadvantaged by the SBA" — are socially and economically disadvantaged. 49 C.F.R. § 26.67(a); Pub. L. No. 112-141 § 1101(b)(2)(B). Persons who fall outside these

specific groups may still qualify as socially or economically disadvantaged, but must prove their disadvantaged status by a preponderance of the evidence. 49 C.F.R. § 26.67(d). Personal assets in excess of $1.32 million negate a claim to "economic disadvantage." *See, id.* § 26.67(a)(2)(i).

The Federal Regulations require recipients of federal transportation funds ("Recipients") to set an overall DBE participation goal pursuant to a two-step process. *Id.* § 26.45. Recipients set goals as a percentage of all federal transportation funds they plan to expend in the next three years. *Id.* § 26.45(e)(1). The end goal must reflect what DBE participation would be in the absence of discrimination. *Id.* § 26.45(b). As long as Recipients administer their DBE programs in good faith, USDOT cannot penalize them for failing to reach their goals. *Id.* § 26.47(a).

The first step in setting a DBE participation goal is to determine the "relative availability of DBEs" in the Recipient's local market. *Id.* § 26.45(b). This figure is based on "demonstrable evidence of the availability of ready, willing, and able DBEs" relative to all other businesses that would be "ready, willing, and able" to bid on federally funded contracts. *Id.* The regulations set out a number of techniques for arriving at the base availability figure, including the use of census data, DBE directories, or disparity studies. *Id.* § 26.45(c).

The second step, if necessary, is to adjust the base availability figure in light of local evidence, such as data concerning DBEs' ability to form, grow, and compete in the marketplace. *Id.* § 26.45(d). If "demonstrable evidence" of past discrimination is available, Recipients may make an upward adjustment to the base figure to account for the continuing effects of past discrimination. *Id.* § 26.45(d)(3).

Once a Recipient sets its overall DBE participation goal, it must meet the "maximum feasible portion" of that goal using race-neutral means. *Id.* § 26.51(a). If the Recipient cannot meet its overall DBE participation goal through race-neutral means, the Recipient must establish DBE participation goals on individual federally funded projects that have subcontracting possibilities. *Id.* § 26.51(d)-(f). A Recipient may adjust its use of race-neutral or race-conscious means in a given year to ensure that it meets, and does not exceed, its overall participation goal. *Id.* § 26.51(f).

To secure a prime contract, bidders are not required to meet individual contract goals as long as they can demonstrate that they have made good faith efforts to do so. *Id.* § 26.53. Appendix A to the Regulations provides specific examples of good faith efforts, which it describes as "those that one could reasonably expect a bidder to take if the bidder were actively and aggressively trying to obtain DBE participation sufficient

to meet the DBE contract goal." *Id.* pt. 26, App. A. If a bidder demonstrates good faith efforts to fulfill the DBE participation goal, the Recipient "must not deny award of the contract on the basis that the bidder/offeror failed to meet the goal." 49 C.F.R. § 26.53(a)(2).

Recipients may apply to USDOT for exemptions or waivers releasing them from their obligations under the Federal Program. *Id.* § 26.15. USDOT may grant an exemption if special circumstances exist that make compliance with the Federal Regulations impractical, and it may grant a waiver if equal opportunity for DBEs can be achieved by other means. *Id.* Recipients must develop outreach programs that foster small business participation across the board, regardless of DBE status. *Id.* If DBEs begin to dominate a particular type of contracting work, Recipients must "devise appropriate measures" to address overconcentration. *Id.* § 26.33.

### 2. *IDOT's Implementation of the Federal Program*

As a condition of receiving federal transportation funds, IDOT must implement the Federal Program described above and set a DBE participation goal as a percentage of the federal transportation funds it will expend in the next three years. *Id.* § 26.45(e). In addition, the Illinois Business Enterprise for Minorities, Females and Persons with Disabilities Act (the "Business Enterprise Act") requires IDOT to implement a DBE

program using the Federal Program standards "for the establishment of goals and [DBE] utilization procedures" on state-funded projects.  30 ILCS 575/6(d).

Since 2005, IDOT has adopted an overall DBE participation goal of 22.7% — a figure it has never achieved in practice.  For 2007 to 2011, IDOT reported DBE participation of 13.98%.  IDOT initially set its 22.77% goal based on the findings of a 2004 NERA availability study (the "2004 NERA Study"), which was updated in 2005.  An availability study determines how many DBEs are "ready, willing, and able" to perform construction work.  To arrive at 22.77% availability, NERA followed the two-step goal-setting process set out in the Federal Regulations.  Although IDOT later consulted with Mason Tillman & Associates ("MTA") to calculate its DBE participation goals, MTA employed the same two-step methodology.

In 2009, IDOT commissioned a disparity study from MTA, which was released in 2011 (the "2011 MTA Study").  A disparity study assesses whether a disparity exists between the utilization and availability of ready, willing, and able DBEs.  The 2011 MTA Study examined the disparity between DBE utilization and availability on more than 4,000 prime contracts and more than 5,500 subcontracts that IDOT awarded between 2006 and 2008.  The study also contained a regression analysis to determine if factors other than discrimination might explain any

statistically significant disparity. MTA's regression analysis indicated that even after controlling for race- and gender-neutral factors such as age and education, minorities and women still experienced discriminatory business conditions, such as lower earnings. In addition to statistical evidence, the 2011 MTA Study examined anecdotal evidence concerning the difficulties DBEs faced in the business community and contracting process, including harassment and exclusion. The 2011 MTA Study concluded that, on both prime contracts and subcontracts in the Illinois road construction industry, DBEs were significantly underutilized.

IDOT sets individual contract goals to achieve the portion of its overall DBE participation goal that cannot be fulfilled by race-neutral means. To set individual contract goals, IDOT identifies what line items of work on a contract could be performed by at least two or more certified DBEs. IDOT adds the dollar value of these line items together, and then divides this amount by the total contract cost to arrive at a maximum DBE participation goal. IDOT then submits the goal to its Bureau of Small Business Enterprises for review. If the Bureau of Small Business Enterprises determines the goal is reasonable and can be supported in the project's locality, IDOT publishes the goal when the contract is let.

Prime contractors, which generally cannot perform more than 50% of the contracting work on their own, must make good faith efforts to subcontract work to DBEs to meet the individual contract goal. When submitting a bid, a prime contractor must submit a utilization plan showing either that it (1) met the DBE participation goal, or (2) did not met the goal, but made "good faith efforts" to do so. IDOT adheres to the guidance regarding good faith efforts contained in the Federal Regulations. *See,* 49 C.F.R. pt. 26, App. A. If a prime contractor demonstrates good faith efforts, IDOT may waive or modify the individual contract goal.

### 3. *IDOT's Target Market Program*

IDOT has also implemented a Target Market Program that applies to state-funded projects in certain parts of Illinois. Under 20 ILCS 2705/2705-600, IDOT's chief procurement officer has authority to implement a target market program "to remedy particular incidents and patterns of egregious race or gender discrimination." Each year, IDOT reviews evidence of discrimination related to transportation construction projects, including the various rates at which minority- and women-owned contractors are utilized, comparative rates of business formation, and anecdotal evidence. Based on this evidence, IDOT may "establish and implement a target market program tailored to address the specific findings of egregious discrimination made

by the Department." 20 ILCS 2705/2705-600. The Target Market program authorizes a number of remedial measures that may be taken to address "egregious discrimination," including the reservation of specific work on a contract for DBEs, incentives for achieving DBE participation goals, and the set-aside of certain contracts for DBEs. Ill. Admin. Code tit. 44 § 6.830.

During this litigation, the Target Market Program operated in IDOT Districts 4 and 8. IDOT concluded that race- and gender-based discrimination was particularly egregious in these districts based on two additional MTA disparity studies.

### 4.    *The Tollway Program*

The Tollway has implemented its own DBE program (the "Tollway Program") since 2005. The Toll Highway Act, 605 ILCS 10/16.3, requires that the Tollway set aspirational goals in awarding contracts to DBEs. The Tollway's Special Provision for Disadvantaged Business Enterprise Participation (the "Special Provision," Ex. E to Tollway Defs.' L.R. 56.1 Stmt., ECF No. 384-5) details the program's operation. Although the Tollway is not obligated to follow the Federal Regulations, it borrows from them substantially. For instance, one of the bodies that certifies DBEs for participation in the Tollway Program, the Illinois Unified Certification Program ("ILUCP"), employs the federal DBE criteria to determine DBE status.

Like IDOT, the Tollway has commissioned several disparity studies. In 2006, the Tollway commissioned a disparity study from NERA assessing DBE utilization on Tollway contracts from 2000 to 2005 (the "2006 NERA Study"). The 2006 NERA Study concluded that "statistically significant adverse disparities" were present among minority and women contractors eligible to perform Tollway work. The 2006 NERA Study also analyzed discrimination on a much broader level, examining disparities in the national construction industry from 1979 to 2002. Controlling for race- and gender-neutral variables, the study revealed a significant negative correlation between a person's race or sex and their earning power and ability to form a business. In 2008, the Tollway commissioned a disparity study from MTA, which was released in 2011. However, the Tollway ultimately rejected the study because its analysis was limited to contracts of $1 million or less, while approximately 60% of the Tollway's construction contracts are valued at over $1 million. In 2013, the Tollway commissioned an additional disparity study from Colette Holt & Associates, which is currently in progress.

The Tollway sets DBE participation goals on individual contracts as a percentage of the contract's total value. In placing a bid, a prime contractor must submit a utilization plan indicating that it has either "obtained sufficient DBE

participation commitments to meet the contract goal" or made good faith efforts to do so. (Special Provision, Ex. E to Tollway Defs.' L.R. 56.1 Stmt., ECF No. 384-5, at 28.) The Tollway follows the Federal Regulations in assessing good faith efforts. If the Tollway determines that a bidder has in fact made a good faith effort to meet the contract's goal — but has been unable to do so — the Tollway may waive or modify the goal.

## C. Complaint

On July 20, 2012, Midwest filed an eighteen-count Complaint against the Federal, IDOT, and Tollway Defendants alleging that the DBE programs described above violate the Equal Protection clause of the United States Constitution, the Civil Rights Act of 1866, the Civil Rights Act of 1964, and the Illinois Civil Rights Act of 2003. (Compl., ECF No. 217.) This Court dismissed Count XVIII, seeking punitive damages against the Tollway, on September 27, 2012. (ECF No. 243.)

As to the Federal Defendants, Midwest seeks a declaration that the Federal Program is unconstitutional on its face (Count I), a declaration that the Federal Program lacks congressional authorization (Count III), a declaration that the Federal Program's authorizing statute is unconstitutional (Count IV), and corresponding injunctive relief (Count VIII). Because Midwest's as-applied challenge to the Federal Program ultimately concerns IDOT's implementation of the program, the

Court interprets Count II as applying to IDOT only. *See,
Sherbrooke Turf, Inc. v. Minn. Dep't of Transp.,* 345 F.3d 964,
973 (8th Cir. 2003) (explaining that because Federal Program
affords recipients substantial discretion in setting goals based
on local conditions, plaintiff's as-applied challenge required
the court to examine state implementation of the program).

With respect to the IDOT Defendants, Midwest seeks a
declaration that IDOT's implementation of the Federal Program is
unconstitutional as applied (Counts II & VI), a declaration that
Section 4(b) of the Business Enterprise Act is unconstitutional
on its face because it imposes a quota (Count V), a declaration
that the Target Market Program is unconstitutional on its face
(Count V), and corresponding injunctive and monetary relief
(Counts VI–VII, IX–XII).

With respect to the Tollway Defendants, Midwest seeks a
declaration that the Tollway Program is unconstitutional on its
face and as applied (Count XIII) and corresponding injunctive
and monetary relief (Counts XIV–XVII).

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when "there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed. R. Civ. P. 56(a). Material
facts are those that affect the outcome of the lawsuit.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  The moving party may meet its burden by showing "there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).  If the moving party satisfies its initial burden, the non-moving party must demonstrate with evidence "that a triable issue of fact remains on issues for which [it] bears the burden of proof." *Knight v. Wiseman,* 590 F.3d 458, 463-64 (7th Cir. 2009).

The judge's role at summary judgment is not to make credibility determinations or weigh the evidence.  *Washington v. Haupert,* 481 F.3d 543, 550 (7th Cir. 2007).  In determining whether a genuine issue of material fact exists, the Court construes all evidence in the light most favorable to the non-moving party.  *Bellaver v. Quanex Corp.,* 200 F.3d 485, 491-92 (7th Cir. 2000).  Where both sides have moved for summary judgment, "the court evaluates each . . . motion on its own merits . . . draw[ing] all reasonable inferences against the party whose motion is under consideration."  *Berrum v. Freyberger,* No. 01 C 802, 2004 WL 557394, at *2 (N.D. Ill. Mar. 19, 2004).

## B. Equal Protection Framework

Midwest claims that the challenged DBE programs are unconstitutional both on their face and as applied. To successfully challenge a law on its face, the challenger shoulders a "heavy burden" and "must establish that no set of circumstances exists under which [an act] would be valid." *United States v. Salerno,* 481 U.S. 739, 745 (1987). In contrast, as-applied challenges are limited to the particular facts of the case. *United States v. Phillips,* 645 F.3d 859, 863 (7th Cir. 2011).

The Equal Protection clause of the Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Through its Due Process clause, the Fifth Amendment imposes an identical requirement on the federal government. *See, Adarand Constructors, Inc. v. Pena* ("*Adarand III*"),* 515 U.S. 200, 217 (1995). Whether a challenge is brought under the Fifth or Fourteenth Amendment, the equal protection analysis is the same. *Id.* All racial classifications, whether imposed by the state or federal government, trigger strict scrutiny. *Id.* at 227. That is, they "must serve a compelling governmental interest, and must be narrowly tailored to further that interest." *Id.* at 235. Gender classifications, on the other hand, trigger intermediate scrutiny. To withstand a

constitutional challenge, the justification for a gender-based classification must be "exceedingly persuasive." *United States v. Virginia,* 518 U.S. 515, 532–33 (1996); *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.,* 743 F.3d 569, 577 (7th Cir. 2014). Because the challenged programs include both race and gender classifications, the Court applies strict scrutiny to the entire program. *See, N. Contracting, Inc. v. Illinois ("Northern III"),* 473 F.3d 715, 721 n.3 (2007).

In conjunction with its equal protection challenge, Midwest seeks relief under the Civil Rights Act of 1866, Title VI of the Civil Rights Act of 1964, and Section 5 of the Illinois Civil Rights Act of 2003. Section 1981 of the Civil Rights Act of 1866 guarantees all persons equal right "to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property." 42 U.S.C. § 1981. Title VI of the Civil Rights Act of 1964 prohibits discrimination in any program or activity receiving federal funding. 42 U.S.C. § 2000d. The Illinois Civil Rights Act creates a state law remedy that parallels Title VI. *Dunnet Bay Constr. Co. v. Hannig,* No. 10-3051, 2014 WL 552213, at *24 (C.D. Ill. Feb. 12, 2014) (citing *Ill. Native Am. Bar Ass'n v. Univ. of Ill.,* 856 N.E.2d 460, 467 (Ill. App. Ct. 2006)), *appeal filed,* Mar. 6, 2014 (No. 14-1493). Statutory claims under § 1981 and Title VI rise and fall with a

plaintiff's equal protection challenge. *See, Grutter v. Bollinger,* 539 U.S. 306, 343 (2003). The Court therefore begins by assessing whether the DBE programs satisfy strict scrutiny.

Under a strict scrutiny analysis, the burden is on the government to show both a compelling interest and narrow tailoring. *Majeske v. City of Chicago,* 218 F.3d 816, 820 (7th Cir. 2000). It is well established that "remedying the effects of past or present racial discrimination" is a compelling interest. *Shaw v. Hunt,* 517 U.S. 899, 909 (U.S. 1996); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 492 (1989) ("It is beyond dispute that any public entity, state or federal, has a compelling interest in assuring that public dollars, drawn from the tax contributions of all citizens, do not serve to finance the evil of private prejudice."). However, the government must also demonstrate "a strong basis in evidence for its conclusion that remedial action [is] necessary." *Croson,* 488 U.S. at 500 (quoting *Wygant v. Jackson Bd. of Educ.,* 476 U.S. 267, 277-78 (1986) (plurality opinion)) (internal quotations omitted). Since *Croson*, numerous courts have recognized that disparity studies provide probative evidence of discrimination. "An inference of discrimination may be made with empirical evidence that demonstrates 'a significant statistical disparity between the number of qualified minority contractors . . . and the number of such contractors actually engaged by the locality or

the locality's prime contractors.'" *Concrete Works of Colo., Inc. v. City and Cnty. of Denver ("Concrete Works II"),* 36 F.3d 1513, 1522 (10th Cir. 1994) (quoting *Croson,* 488 U.S. at 509). Anecdotal evidence may be used in combination with statistical evidence to establish a compelling governmental interest. *Croson,* 488 U.S. at 509.

In addition to providing "hard proof" to back its compelling interest, the government must also show that the challenged program is narrowly tailored. *Majeske,* 218 F.3d at 820 (citing *Adarand III,* 515 U.S. at 235). That is, "the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Wygant,* 476 U.S. at 280. "An affirmative action plan is narrowly tailored if, as a practical matter, 'it discriminates against whites as little as possible consistent with effective remediation.'" *Majeske,* 218 F.3d at (quoting *McNamara v. City of Chicago,* 138 F.3d 1219, 1221 (7th Cir. 1998)). While narrow tailoring requires "serious, good faith consideration of workable race-neutral alternatives," it does not require "exhaustion of every conceivable race-neutral alternative." *Grutter,* 539 U.S. 306, 339 (2003); *Fisher v. Univ. of Tex. at Austin,* 133 S.Ct. 2411, 2420 (2013).

"Once the governmental entity has shown acceptable proof of a compelling interest in remedying past discrimination and

illustrated that its plan is narrowly tailored to achieve this goal, the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional." *Majeske,* 218 F.3d at 820; *see also, Wygant,* 476 U.S. at 277–78 ("The ultimate burden remains with the [plaintiff] to demonstrate the unconstitutionality of an affirmative-action program."). To successfully rebut the government's evidence, a challenger must introduce "credible, particularized evidence" of its own. *Concrete Works of Colo. v. City & Cnty. of Denver ("Concrete Works IV"),* 321 F.3d 950, 959 (10th Cir. 2003) (quoting *Adarand Constructors, Inc. v. Slater ("Adarand VII"),* 228 F.3d 1147, 1175 (10th Cir. 2000) (internal quotations omitted). This can be accomplished by providing a neutral explanation for the disparity between DBE utilization and availability, showing that the government's data is flawed, demonstrating that the observed disparities are statistically insignificant, or present contrasting statistical data. *Id*. Conjecture and unsupported criticisms of the government's methodology are insufficient. *Id.*

Plaintiff argues that *Fisher v. Univ. of Texas,* which involved the use of racial classifications in university admissions, has altered the equal protection analysis by placing the "ultimate burden" on the government. (Pl.'s Mem., ECF No. 374, at 13-14.) This is not the case. In *Fisher,* the

Supreme Court held that the Fifth Circuit had misapplied strict scrutiny when, under the narrow tailoring prong of the analysis, it presumed that the university had acted in good faith in considering race-neutral alternatives. *Fisher,* 133 S.Ct. at 2420. The Court made clear that "[s]trict scrutiny require[s] a court to examine with care, and not defer to, a university's 'serious, good faith consideration of workable race-neutral alternatives.'" *Id.* at 2420 (quoting *Grutter,* 539 U.S. at 340). As the Fifth Circuit noted on remand, *Fisher* is consistent with the "broader equal protection jurisprudence" that exists outside the context of university admissions, not a departure from it. *Fisher v. Univ. of Tex. at Austin,* 758 F.3d 633, 665–66 (5th Cir. 2014) ("Because the higher-education affirmative action cases do not stand apart from 'broader equal protection jurisprudence,' strict scrutiny must be applied with the same analytical rigor deployed in those other contexts. Put simply, there is no special form of strict scrutiny unique to higher education admissions decisions.") (quoting *Fisher,* 133 S.Ct. at 2418). In the broader equal protection context the Fifth Circuit refers to, the government must show that a challenged program is narrowly tailored to serve a compelling interest. Upon making that showing, however, "the party challenging the affirmative action plan bears the ultimate burden of proving that the plan is unconstitutional." *Majeske,* 218 F.3d at 820.

### III. ANALYSIS

Before arriving at the merits of Midwest's equal protection claims, the Court will address the issue of standing and rule on the Federal and IDOT Defendants' Motion to Exclude the Expert Testimony and Opinions of Dr. Jonathan Guryan.

### A. Standing

The Court begins by revisiting the issue of standing, which it examined in detail in its previous order. *See, Midwest Fence Corp. v. U.S. Dep't of Transp.,* No. 10 C 5627, 2011 WL 2551179, at *10 (N.D. Ill. June 27, 2011). Standing requires (1) "injury in fact," (2) causal connection between the injury and the complained-of conduct, and (3) the likelihood that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). At summary judgment, it is the plaintiff's burden to set forth specific facts establishing these elements. *Id.* at 561. Federal courts have an independent obligation to examine jurisdiction, "and standing is perhaps the most important of [the jurisdictional] doctrines." *FW/PBS, Inc. v. City of Dallas,* 493 U.S. 215, 231 (1990) (citation and internal quotations omitted), *overruled on other grounds by City of Littleton, Colo. v. Z.J. Gifts D-4, LLC,* 541 U.S. 774, (2004).

In its prior ruling, the Court relied on the Supreme Court's decision in *Northeastern Florida Gen. Contractors v.*

*Jacksonville,* which held that in the context of government set-aside programs benefitting minorities, (1) "injury in fact" is the "inability to compete on an equal footing in the bidding process, not the loss of a contract," and (2) causation and redressability necessarily flow from that injury. *Northeastern Florida,* 508 U.S. 656, 666 (1993). Nevertheless, "Article III standing to bring an equal protection challenge is not without limits." *Braunstein v. Ariz. Dep't of Transp.,* 683 F.3d 1177, 1185 (9th Cir. 2012). "The rule against generalized grievances applies with as much force in the equal protection context as in any other." *United States v. Hays,* 515 U.S. 737, 743 (1995).

The Tollway argues that new evidence produced in discovery shows that the Tollway Program is distinct from the 10% set-aside in *Northeastern Florida*. Therefore, the Tollway argues, the Court should reject the "collapsibility" standard articulated in *Northeastern Florida,* in which causation and redressability flow from injury. The Court rejected the Tollway's argument in its prior order, and does so again for the same reasons. Although the challenged DBE programs are not mandatory set-asides, the Court continues to find *Northeastern Florida* to provide the "better analytic approach." *Midwest,* 2011 WL 2551179, at *10; *see also, N. Contracting, Inc. v. State of Ill. ("Northern I"),* No. 00 C 4515, 2004 WL 422704, at *24 (N.D. Ill. Mar. 3, 2004).

In support of its claim that it cannot compete on an equal footing with DBEs as a result of the challenged programs, Midwest has provided evidence of lost IDOT and Tollway bids, decreased revenue, and difficulties sustaining its business. (*See, e.g.,* Exs. 46-48, 57, 69 to Pl.'s Mem., ECF Nos. 379-6-379-8, 381-7, 382-9.)  The Tollway argues that "[Midwest] has only identified six Tollway subcontracts during these five and a half years of the Tollway's DBE Program where it was the low bidder but lost the subcontract to a DBE."  (Tollway L.R. 56.1 Stmt., ECF No. 384, ¶ 97.)  However, as this Court previously noted, "the inability to compete on equal footing for even one contract would constitute an injury." *Midwest,* 2011 WL 2551179, at *6.  Based on the evidence provided, the Court finds that Midwest has standing to challenge the Federal Program, IDOT's implementation of it, and the Tollway Program.

However, the Court does not find that Midwest has presented any facts suggesting its inability to compete on an equal footing for Target Market Program contracts.  The Target Market Program identifies a variety of remedial actions that IDOT was authorized to take in Districts 4 and 8.  These measures include individual contract goals, DBE participation incentives, as well as set-asides.  Ill. Admin. Code. tit. 44 § 6.830.  Although Midwest's "Jobs Lost" spreadsheets show that Midwest bid on contracts in Districts 4 and 8, it does not identify which of

those contracts — if any — were subject to the Target Market Program. Nor does Midwest identify any set-asides that were in place in Districts 4 and 8 that would have hindered its ability to compete for fencing and guardrail work. Although Midwest submits several reports on the program discussing special lettings that took place in District 8 in 2012 and 2013 (*see,* Ex. 92 to Pl.'s Mem., ECF No. 386-2), Midwest ascribes no significance to them. Indeed, the majority of the 17 contracts offered in the special lettings involved landscaping work. (*Id.* at 4152-53.) Midwest has not alleged that it "would have bid on contracts set aside pursuant to the [Target Market Program]" had it not been prevented from doing so. *Ne. Fla.*, 508 U.S. at 668; *see also Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002) ("[The] existence of a racial or gender barrier is [not] enough [to establish standing], without a plaintiff's showing that she has been, or is genuinely threatened with the likelihood of being, subjected to such a barrier."). Because nothing in the record Midwest has provided suggests that the Target Market Program impeded Midwest's ability to compete for work in Districts 4 and 8, the Court dismisses Midwest's claim (Count V, in part) relating to the Target Market Program for lack of standing.

## B. Motion to Exclude Dr. Jonathan Guryan

The Court next addresses the Federal and Tollway Defendants' motions to exclude the opinions and expert testimony of Midwest's expert, Dr. Jonathan Guryan. (Fed. Defs.' Mot. to Exclude Guryan, ECF No. 335; Tollway Defs.' Mot. to Exclude Guryan, ECF No. 341.) Dr. Guryan's expert report (the "Guryan Report," Ex. 61 to Pl.'s Mem., ECF No. 382-1) and rebuttal report (the "Guryan Rebuttal Report," Ex. 62 to Pl.'s Mem., ECF No. 382-2) attack the methodology used in the 2004 NERA and 2011 MTA studies prepared for IDOT and the 2006 NERA study prepared for the Tollway. Dr. Guryan's criticisms also apply to the report of the Federal Defendants' expert, Dr. Jon Wainwright (the "Wainwright Report," ECF No. 371-3). (*See,* Rebuttal Report, Ex. 62 to Pl.'s Mem., ECF No. 382-2, at 3.) Dr. Guryan's main objection to these materials is that they omit important variables, namely capacity, and thus do not accurately measure DBE availability and underutilization. In Dr. Guryan's words, his opinions are general attacks on Defendants' statistical methodology: "I would say the opinions that I am offering are about . . . the use of statistics to measure the presence of discrimination in markets, and . . . the opinions that I have are general opinions that apply to more than just one market." (Ex. E to Federal Defs.' Mot. to Exclude Guryan, ECF No. 336-10, at 38.)

The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579 (1993). Rule 702 provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. The Seventh Circuit has distilled Rule 702 into a three-part inquiry. Expert testimony is admissible if (1) the expert is qualified, (2) the expert's reasoning or methodology is reliable, and (3) the expert's testimony will assist the trier of fact. *Hartman v. EBSCO Indus., Inc.*, 758 F.3d 810, 817 (7th Cir. 2014). The decision to admit or exclude expert testimony is committed to the sound discretion of the district court. *Cummins v. Lyle Indus.*, 93 F.3d 362, 367 (7th Cir. 1996).

"[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *United States v. Parra,* 402 F.3d 752, 758 (7th Cir. 2005) (citation and internal quotations omitted). In determining whether an expert is qualified, the

Court must ask whether the expert's qualifications "provide a foundation for [him] to answer a specific question." *Gayton v. McCoy,* 593 F.3d 610, 617 (7th Cir. 2010) (citation and internal quotations omitted).

Dr. Guryan's qualifications are set forth fully in his reports. Dr. Guryan holds a Ph.D. in economics from the Massachusetts Institute of Technology and serves as an Associate Professor of Economics and Human Development and Social Policy at Northwestern University, where he teaches a graduate level course in quantitative methods and regression analysis. Dr. Guryan describes himself as "a labor economist who conducts research primarily on the causes and consequences of racial inequality in labor markets and in education, on the economics of discrimination, and on the economics of education and human capital." (Guryan Rebuttal Report, Ex. 62 to Pl.'s Mem., ECF No. 382-2, at 1.) Dr. Guryan's research, which has been published in various journals, typically requires the analysis of large datasets using regression analysis and other statistical techniques. As an editor of the Journal of Labor Economics and a reviewer for other statistical and economics journals, Dr. Guryan reviews the scientific quality of the studies the journals publish. Although Dr. Guryan is not an expert in DBE programs, the specific question Midwest seeks to answer is whether Defendants' statistical methodology provides

reliable evidence of discrimination.  The Court finds that Dr.
Guryan's background qualifies him to render opinions on the
statistical methods Defendants use.

Dr. Guryan's primary conclusion is that Defendants' studies
"are biased and may over or under state DBE availability"
because they "include firms that may not be willing or able to
do project work for IDOT or [the Tollway], and [do not]
account[] for differences in the ability of firms to provide
work."  (Guryan Rep., Ex. 61 to Pl.'s Mem., ECF No. 382-1, at
13.)  The reasoning behind Dr. Guryan's conclusion is a
collection of generalized principles of research in the social
sciences: Statistical reliability and validity depend on the
quality of the data used; Bias can result when certain variables
are omitted from regression analyses; To link disparity to
discrimination, it is necessary to account for other variables,
especially capacity.  (*See, id.* at 4-13.)  Midwest argues that
Guryan's reasoning is consistent with other expert criticism
that has been lodged against disparity studies that overlooked
the capacity variable.  *See, e.g., Rothe Dev. Corp. v. Dep't of
Def.,* 545 F.3d 1023, 1043 (Fed. Cir. 2008).

Defendants argue that Dr. Guryan's reasoning is not
reliable because it merely offers speculation about flaws in
Defendants' methodology, rather than providing an independent
analysis of the challenged data.  As the Tollway Defendants

state, "Dr. Guryan speculates that certain impacting variables were omitted from NERA's analysis, but he has not conducted any statistical analysis whatsoever demonstrating *any* actual bias — big or small — in the results due to *any* purportedly omitted variables." (Tollway Defs.' Mot. to Join Fed. Defs.' Mot to Exclude Guryan, ECF No. 341, at 3.) To actually rebut the inference of discrimination the studies create, Defendants argue that Dr. Guryan cannot merely point "to the hypothetical potential for omitted variable bias, without actually introducing evidence that shows such a bias." (*Id.*) Because Dr. Guryan's criticisms are largely speculative, Defendants argue, they are of little value to the trier of fact.

Defendants' argument, however, goes to the probative weight of Dr. Guryan's broad-based criticism rather than to its admissibility. "From an admissibility perspective, . . . experts' critiques and analyses of [a] statistical case are sufficient. More affirmative analyses are not required, although they may be advisable." *EEOC v. Morgan Stanley & Co.,* 324 F.Supp.2d 451, 460 (S.D.N.Y. 2004). Here, the principles on which Dr. Guryan relies are some of the basic ground rules of social science research and statistical analysis, drawn from Dr. Guryan's background as a labor economist. Although the principles are general, the Court finds them reliable. In addition, Midwest notes that "[s]ome of the points are basic but

necessary to understand the role of statistics." (Midwest Resp. to Mot. to Exclude Guryan, ECF No. 347, at 4.) Dr. Guryan's testimony may have additional value in educating the fact-finder about basic statistical principles. *See,* FED. R. EVID. 702 advisory committee's note to 2000 amendment.

For these reasons, the Federal and Tollway Defendants' Motions to exclude the opinions and testimony of Dr. Guryan are denied.

## C. Facial Challenge to the Federal Program

Turning to the merits, Midwest first challenges that the Federal Program and its current authorizing statute, MAP-21, are unconstitutional on their face. The Court is not the first to consider the constitutionality of the Federal Program, which numerous appellate and district courts have previously upheld. *See, W. States Paving Co., Inc. v. Wash. State Dep't of Transp.,* 407 F.3d 983 (9th Cir. 2005); *Sherbrooke Turf,* 345 F.3d 964; *Adarand VII,* 228 F.3d 1147; *Geyer Signal, Inc. v. Minn. Dep't of Transp.,* No. CIV. 11-321 JRT/LIB, 2014 WL 1309092 (D. Minn. Mar. 31, 2014); *Northern I,* 2004 WL 422704.

### 1. Compelling Interest

As noted above, remedying the effects of race and gender discrimination within the road construction industry is a compelling governmental interest. *See, e.g., Croson,* 488 U.S. at 492. At issue is whether the Federal Defendants have

supported their claimed compelling interest with a "strong basis in evidence," as *Croson* requires.

The Federal Defendants present an extensive body of testimony, reports, and studies that they claim provides the "strong basis in evidence" for their conclusion that race- and gender-based classifications are necessary. Specifically, the Federal Defendants offer the Wainwright Report, (Wainwright Rep., Ex. B to Fed. Defs.' Mem., ECF No. 371-3, at 7), and a collection of evidence presented to Congress in support of the Federal Program's 2012 reauthorization under MAP-21, including both statistical and anecdotal evidence. Midwest seeks to exclude much this evidence because the witnesses who testified before Congress, including Dr. Wainwright, were not previously disclosed. However, the Court may take judicial notice of the existence of congressional hearings and reports. *Midwest,* 2011 WL 2551179, at *13; *Adarand VII,* 228 F.3d at 1168 n.12.

In 2007 and 2008, Dr. Wainwright was one of several experts to testify before Congress in support of the Federal Program, offering evidence that earnings and business formation rates remained disproportionately low among minorities and women. Other experts provided data regarding the chronic lack of wealth in minority communities and the difficulties minority business owners face in obtaining business loans. They also introduced statistical evidence gathered through disparity studies showing

the underutilization of minority- and women-owned businesses nationwide. In addition to expert testimony, Congress heard anecdotal accounts of discrimination from minority and women business owners. Congress reviewed this material and concluded that it established "a strong basis . . . for the continuation of the disadvantaged business enterprise program to address race and gender discrimination in surface transportation-related business." Pub. L. 112-141, § 1101(b).

The Wainwright Report offers similar data. For his report, Dr. Wainwright reviewed ninety-five disparity and availability studies concerning minority- and women-owned businesses, as well as anecdotal evidence. Completed from 2000 to 2012, the studies examined procurement for over one hundred public entities and funding sources across 32 states. Of the 95 studies performed, 21 were conducted under Dr. Wainwright's direction. Sixty-four of the studies had previously been presented to Congress.

In describing the methodology for calculating availability, Dr. Wainwright opined that metrics such as firm revenue, number of employees, and bonding limits should not be considered when determining DBE because they are all "likely to be influenced by the presence of discrimination if it exists" and could potentially result in a "built-in downward bias in the availability measure." (Wainwright Rep., Ex. B to Fed. Defs.' Mem., ECF No. 371-3, at 7.) To measure disparity, Dr.

Wainwright divided DBE utilization by availability and multiplied the result by 100 to calculate a "disparity index" for each study. According to the Wainwright Report, 66% of the studies he examined showed a disparity index of 80 or below. (*Id.* at 33.) That is, 66% of the studies indicated that DBEs were significantly underutilized relative to their availability. (*Id.*) Thirty-three of the disparity studies examined the use of DBEs by state departments of transportation ("DOT") for construction work. Of the 33 state DOT studies, 79% had a disparity index of 80 or below. (*Id.* at 44.) Dr. Wainwright also examined data showing lower earnings and business formation rates among women and minorities, even when variables such as age and education were held constant. (*Id.*) Ultimately, Dr. Wainwright concluded that the disparities were not attributed to factors "other than race and sex" and were "consistent with the presence of discrimination in construction and construction-related professional services." (*Id.* at 66.)

Midwest argues that Dr. Wainwright's failure to account for capacity when measuring availability and disparity "renders the statistical evidence supporting the Federal [R]egulations . . . non-probative of discrimination." (Pl.'s Mem., ECF No. 374, at 35.) Broadly, "capacity" is a measure of business size that can potentially impact availability and disparity calculations. *Rothe,* 545 F.3d at 1043; *see also, Eng'g Contractors Ass'n of S.*

*Fla. Inc. v. Metro. Dade Cnty.,* 122 F.3d 895, 917 (11th Cir. 1997) ("It follows that, all other factors being equal and in a perfectly nondiscriminatory market, one would expect the bigger [non-DBE] firms to get a disproportionately higher percentage of total construction dollars awarded than the smaller [DBE] firms."). According to Midwest and Dr. Guryan, the failure to account for capacity can skew the results of availability and disparity studies. Midwest notes that in *Rothe,* a case concerning a similar DBE program for Department of Defense contracts, the Federal Circuit explicitly rejected a set of disparity studies that failed to account for this variable. *Rothe,* 545 F.3d at 1045.

*Rothe,* however, is distinguishable. In *Rothe,* only six disparity studies were offered to support the government's compelling interest in implementing a national program. *Id.* at 1046. Collectively, they covered only "one state, two counties, and three cities." *Id.* In holding this limited data set insufficient, the court cautioned, "we do not necessarily disapprove of decisions by other circuit courts that have relied, directly or indirectly, on municipal disparity studies to establish a federal compelling interest. Different studies, in the context of different legislative history, may support different conclusions." *Id.* The court referenced the federal highway construction industry as an example where a "different

conclusion" was warranted, noting that *Adarand VII and W. States* relied on a report analyzing over 50 disparity studies. *Id.*

Unlike the reports at issue in *Rothe,* the Wainwright Report draws from 95 studies covering 32 states. In addition, although the 21 disparity studies Wainwright conducted himself did not directly account for capacity, the other seventy-five studies in the report used a variety of different methodologies. Moreover, the Wainwright Report supplements the testimony and reports presented to Congress in support of the Federal Program, which courts have readily found to establish a "strong basis in evidence" to support the government's conclusion that race- and gender-conscious action is necessary. *See, Northern I,* 2004 WL 422704, at *34 ("This court agrees with the *Adarand VII* and *Sherbrooke Turf* courts that this evidence is sufficient to establish a compelling governmental interest." ).

This Court also agrees, and finds that through the Wainwright Report and evidence presented to Congress, the Federal Defendants have satisfied their burden in showing that the Federal Program stands on a strong basis in evidence. Dr. Guryan's suggestion that the studies in the Wainwright Report do not properly account for capacity does not compel the Court to find otherwise. *See, Adarand VII,* 228 F.3d at 1173 n.14 (10th Cir. 2000) ("[G]eneral criticism of disparity studies, as opposed to particular evidence undermining the reliability of

the particular disparity studies relied upon by the government, is of little persuasive value and [does not] compel[] us to discount the disparity evidence."); *Geyer Signal,* 2014 WL 1309092, at *15 ("[D]espite their apparent disagreement with the evidence presented by the Federal Defendants and that considered by Congress, Plaintiffs have 'failed to present affirmative evidence that no remedial action was necessary.'").

## 2. *Narrow Tailoring*

Once the government has established a compelling interest for implementing a race-conscious program, it must show that the program is narrowly tailored to achieve this interest. *Majeske,* 218 F.3d at 820 (citing *Adarand III,* 515 U.S. at 235). In determining whether a program is narrowly tailored, courts examine several factors, including: "(a) the necessity for the relief and efficacy of alternative [race-neutral] measures, (b) the flexibility and duration of the relief, including the availability of waiver provisions, (c) the relationship of the numerical goals to the relevant labor market, and (d) the impact of the relief on the rights of third parties" (the "*Paradise* Factors"). *United States v. Paradise,* 480 U.S. 149, 171 (1987) (plurality opinion); *N. Contracting, Inc. v. State of Ill.* ("*Northern II*"), No. 00 C 4515, 2005 WL 2230195, at *17 (N.D. Ill. Sept. 8, 2005) (applying *Paradise* Factors), *aff'd,* 473 F.3d 715 (7th Cir. 2007). Courts may also assess whether a program

is "overinclusive." *Croson,* 488 U.S. at 506.  The Court finds that each of the above factors supports the conclusion that the Federal Program is narrowly tailored.  The Court examines each factor in turn.

First, under the Federal Regulations, Recipients can only turn to race- and gender-conscious measures after they have attempted to meet their DBE participation goal through race-neutral means.  49 C.F.R. § 26.51(a).  Race-neutral means include making contracting opportunities more accessible to small businesses, providing assistance in obtaining bonding and financing, and offering technical and other support services. *Id.* §§ 26.51(b), 26.39.  If a Recipient can achieve (or expects to exceed) its DBE participation goal through race-neutral means, it must reduce or eliminate existing contract goals accordingly.  *Id.* § 26.51(f).  In light of the overt requirement that Recipients maximize DBE participation through race-neutral means, the Court finds that the Regulations clearly require "serious, good faith consideration of workable race-neutral alternatives." *Grutter,* 539 U.S. at 339.

Second, the Regulations contain provisions that limit the Federal Program's duration and ensure its flexibility.  The Federal Program lasts only as long as its current authorizing act allows.  *See,* Highway and Transportation Act of 2014, Pub. L. 113-159 § 1001(a), 128 Stat. 1839, 1840 (2014) (extending

MAP-21's authorization until May 31, 2015). With each reauthorization, Congress must reevaluate the Program in light of supporting evidence.

The Federal Program affords Recipients and prime contractors substantial flexibility. Recipients may apply for exemptions or waivers, releasing them from program requirements if they can demonstrate special circumstances or achieve DBE participation by other means. 49 C.F.R. § 26.15. Prime contractors can apply to IDOT for a "good faith efforts waiver" on an individual contract goal. If a prime contractor demonstrates that it has made good faith efforts to meet the contract goal, but has been unable to do so, IDOT must reduce or eliminate the goal. *Id.* § 26.53(a)(2). The availability of waivers is particularly important in establishing flexibility. *Adarand VII,* 228 F.3d at 1177. Although Midwest counters that the Federal Regulations impose a "quota," (Pl.'s Resp. to Fed. Defs. Mem., ECF No. 423-2, at 10), the Court does not find this to be the case in light of the program's explicit waiver provision. The availability of waivers, coupled with regular congressional review, leads the Court to find that the Federal Program is sufficiently limited and flexible.

Third, the Federal Program employs a two-step goal-setting process that ties Recipients' DBE participation goals to local market conditions. The Regulations do not call for blind

adherence to the national 10% goal or lockstep proportionality with minorities' representation in the local population. 49 C.F.R. §§ 26.41, 26.47; *see, Croson,* 488 U.S. at 507. To the contrary, they delegate goal setting to Recipients who tailor DBE participation to local DBE availability. 49 C.F.R. § 26.45. The Court finds that the Federal Program's goal-setting process "requires the States to focus on establishing realistic goals for DBE participation" that are closely tied to the relevant labor market. *Sherbrooke Turf,* 345 F.3d at 972.

Fourth, the Regulations contain provisions that seek to minimize the program's burden on non-DBEs — from the way in which DBE status is determined to the requirement that overconcentration be controlled. The Federal Program's presumption of social and economic disadvantage is rebuttable, and persons who are not presumptively disadvantaged may nonetheless qualify as DBEs. Through these provisions, "race is made relevant in the program, but it is not a determinative factor." *Id.* at 973. In the event DBEs become "over-concentrated" in a particular area of contract work, Recipients must take appropriate measures to address the overconcentration. 49 C.F.R. § 26.33(a). Other provisions discussed above, such as the use of race-neutral measures to meet DBE participation goals and the availability of good faith efforts waivers, aim to keep the burden on non-DBEs minimal.

Although state laws require Recipients award prime contracts to the lowest bidder, the Regulations prescribe that DBE participation goals be applied to the value of the entire contract. *See, id.* § 26.53(i). Throughout its briefing, and against all Defendants, Midwest's primary argument is that this practice unduly burdens non-DBE subcontractors. Midwest argues that because most DBEs are small subcontractors, "[s]etting goals as a percentage of all contract dollars, while requiring the remedy to come only from subcontracting dollars, unduly burdens smaller, specialized non-DBEs." (Midwest Resp. to All Defs., ECF No. 429-2, ¶ 3.) However, the fact that innocent parties may bear some of the burden of a DBE program "is itself insufficient to warrant the conclusion that [a] program is not narrowly tailored." *Adarand VII,* 228 F.3d at 1183. The Court also finds that "strong policy reasons" support the Federal Program's approach. *See, Northern II,* 2005 WL 2230195, at *20. Namely, it is the only way to address the pervasive, indirect effects of discrimination that have kept many DBEs from bidding as primes in the first place. *Id.*

Finally, Dr. Wainwright's report and congressional testimony provide evidence that the Federal Program is not overly inclusive. Analyzing the Census Bureau's *Survey of Small Business Owners*, Dr. Wainwright observed "large and statistically significant disparities [in business formation and

earnings rates] . . . in all 50 states and the District of Columbia, for all minority groups — Blacks, Hispanics, Asians and Pacific Islanders, and Native Americans — as well as for non-minority women." (Wainwright Rep., Ex. B to Fed. Defs.' Mem., ECF No. 371-3, at 38). While Midwest argues that the Federal Program is overinclusive, it does not attempt to rebut the Federal Defendants' evidence.

Because the Federal Program stands on a "strong basis in evidence" and is narrowly tailored to achieve the goal of remedying discrimination, the Court finds that it is constitutional on its face. The Court therefore grants summary judgment in favor of the Federal Defendants on Counts I, IV, and VIII. The Court also grants the Federal Defendants' summary judgment on Count III, Midwest's claim that the Federal Regulations lack congressional authorization because they "create, and deprive some of, substantive rights" and unlawfully delegate authority to Recipients. (Compl., ECF No. 217, ¶¶ 84–88.) As discussed above, the Federal Program does not impose an undue burden on non-DBEs so as to create substantive rights, and it properly delegates goal setting to Recipients to ensure that DBE participation is tied to local conditions.

### D. As-Applied Challenge to IDOT's Implementation of the Federal Program

In addition to challenging the Federal Program on its face, Midwest also argues that it is unconstitutional as applied. Because the Federal Program is applied to Midwest through IDOT, the Court must examine IDOT's implementation of the Federal Program. Whether the Federal Program is unconstitutional as applied is a question of whether IDOT exceeded its authority in implementing it. *Northern III,* 473 F.3d at 722 ("[A] challenge to a state's application of a federally mandated program must be limited to the question of whether the state exceeded its authority.").

In upholding the facial constitutionality of the Federal Program, the Court has found that the Federal Defendants have a compelling interest in remedying the effects of discrimination in the highway construction industry. In implementing the Federal Program, IDOT may also rely on this compelling interest, at least with respect to USDOT-assisted projects. *See, id.* at 721. However, IDOT not only applies the Federal Program to USDOT-assisted projects, as the Federal Regulations require, it also applies the Federal Program to state-funded projects. *See,* 30 ILCS 575/6(d). The Court must therefore determine whether the IDOT Defendants have established a compelling reason to apply the IDOT Program to state-funded projects in Illinois.

Relatedly, narrow tailoring requires that the Federal Program "be limited to those parts of the country where race-based measures are demonstrably needed." *Sherbrooke Turf,* 345 F.3d at 971; *Northern II,* 2005 WL 2230195, at *16 ("The federal DBE program delegates this tailoring function to the state; thus, IDOT must demonstrate, as part of the narrowly tailored prong, that there is a demonstrable need for the implementation of the federal DBE program within its jurisdiction."). Accordingly, the Court will begin by assessing whether IDOT has established evidence of discrimination in Illinois sufficient to (1) support its application of the Federal Program to state-funded contracts, and (2) demonstrate that IDOT's implementation of the Federal Program is limited to a place "where race-based measures are demonstrably needed." *Sherbrooke Turf,* 345 F.3d at 971. After examining whether IDOT has provided reliable evidence of discrimination and DBE availability in the Illinois road construction industry, the Court will address the relevant *Paradise* Factors.

### 1. IDOT's Evidence of Discrimination and DBE Availability in Illinois

The Court first turns to the evidence that IDOT has presented to establish the existence of discrimination in Illinois: the 2004 NERA Study and the 2011 MTA Study. Although the 2004 NERA Study primarily examined DBE availability, it also

made specific findings regarding the existence of discrimination in Illinois. For example, the study uncovered disparities in earnings and business formation rates among women and minorities in the construction and engineering fields, which Dr. Wainwright concluded were consistent with discrimination. IDOT maintains that the 2004 NERA Study and 2011 MTA Study must be read in conjunction with one another, and in light of the anecdotal evidence they contain. The 2011 MTA Study is the critical piece, however. It establishes the "disparity" from which IDOT's inference of discrimination primarily arises.

The 2011 MTA Study compared the proportion of contracting dollars awarded to DBEs (utilization) with the availability of DBEs. MTA determined availability through seven different sources — including bidders lists, prequalified business lists, and other methods recommended in the Federal Regulations. MTA also applied North American Industry Classification ("NAICS") codes to different types of contract work, such as heavy and civil engineering construction and highway, street, and bridge construction, assigning greater weight to categories of work in which IDOT had expended the most money. This resulted in a "weighted" DBE availability calculation.

The 2011 MTA Study examined more than 4,000 prime contracts of varying dollar amounts, and approximately 5,500 subcontracts that IDOT awarded from 2006 to 2008. It also examined anecdotal

evidence concerning race and gender discrimination in the Illinois road construction industry, including one-on-one interviews and a survey of more than 5,000 contractors. The 2011 MTA Study contained a regression analysis of private sector data that found disparities in earnings and business ownership rates among minorities and women, even when controlling for race- and gender-neutral variables. Ultimately, the study concluded that there was a "statistically significant underutilization of DBEs in the award of both prime and subcontracts" in Illinois. (IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368, ¶ 22). For example, DBEs made up 25.55% of available prime construction contractors, but received only 8.25% of prime construction contracts under $500,000, and only 10.38% of prime contracts under $25,000. (2011 MTA Study, Ex. G to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-7, at 8-4, 8-10.) Likewise, DBEs made up 29.24% of available construction subcontractors, but received only 10.65% of construction subcontracts. (*Id.* at 9-3.)

The Court next turns its attention to the evidence IDOT has presented to measure DBE availability in Illinois: the 2004 NERA Study and two subsequent goal-setting reports that MTA prepared (the "MTA Goal-Setting Reports"). (2012–2015 & 2013–2015 Goal-Setting Reports, Exs. P & Q to IDOT Defs.' L.R. 56.1 Stmt., ECF Nos. 368-16 & 368-17.) The 2004 NERA Study arrived at IDOT's

22.77% DBE participation goal in accordance with the two-step process defined in the Federal Regulations, which the Court has already discussed. *See,* 49 C.F.R. § 26.45. To calculate baseline DBE availability under step one, NERA employs a seven-step "custom census." (2004 NERA Study, Ex. K to IDOT Def.'s L.R. 56.1 Stmt., ECF No. 368-11, at 41–42.) The process begins by identifying the relevant markets in which IDOT operates and the categories of businesses that account for the bulk of IDOT spending. (*Id.* at 41.) The industries and counties in which IDOT expends relatively more contract dollars receive "proportionately higher weights in the ultimate calculation of statewide DBE availability." (*Id.*) NERA then counts the number of businesses in the relevant markets, and identifies which are minority- and women-owned. (*Id.*) To ensure the accuracy of this information, NERA takes additional steps to verify the ownership status of each business. (*Id.*) Using this methodology, NERA arrived at a base DBE availability of 22.77%. (*Id.* at 64.) Under step two, NERA adjusted this figure to 27.51% based on Census Bureau data "to take account of the fact that baseline numbers are artificially lower than what would be expected in a race-neutral marketplace." (*Id.*)

While the 2004 NERA Study supported IDOT's overall goal until 2012, IDOT recently turned to MTA to prepare its Goal-Setting Reports. (Exs. P & Q to IDOT Defs.' L.R. 56.1 Stmt.,

2012–2015 & 2013–2015 Goal-Setting Reports, ECF Nos. 368-16 & 368-17.) The Goal-Setting Reports also calculated IDOT's DBE participation goal pursuant to the two-step process in the Federal Regulations, drawing from bidders lists, DBE directories, and the 2011 MTA Study to calculate baseline DBE availability. Like the 2011 MTA Report, the Goal-Setting Reports gave greater weight to the types of contract work in which IDOT had expended relatively more money.

Midwest challenges the accuracy of IDOT's data on several grounds. For instance, Midwest argues that the anecdotal evidence contained in the 2011 MTA Report does not prove discrimination. However, where anecdotal evidence has been offered in conjunction with statistical evidence, as is the case here, it may "lend support" to the government's determination that remedial action is necessary. *Croson,* 488 U.S. at 509. This proposition is not inconsistent with *Wal-Mart v. Dukes,* as Midwest urges. *Wal-Mart* simply cautioned that anecdotal evidence on its own could not be used to show a general policy of discrimination. *Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2556 n.9 (2011). Through Dr. Guryan, Midwest also challenges that data collected after IDOT's implementation of the Federal Program may be biased because "[a]nything observed about the public sector may be affected by the DBE Program." The Court rejects this argument as well, finding post-enactment

evidence of discrimination permissible. *See, Concrete Works II,*
36 F.3d at 1521. ("The strong weight of authority endorses the
admissibility of post-enactment evidence to determine whether an
affirmative action contract program complies with *Croson.*").

Midwest's main objection to the IDOT Defendants' evidence
is that it failed to account for capacity when measuring DBE
availability and underutilization. Midwest argues that the 2004
NERA Study did not measure whether all "available" DBEs were
actually "ready, willing, and able" to take on work, and also
failed to distinguish between prime and subcontractors. Midwest
similarly argues that the 2011 MTA Study omitted capacity from
its DBE availability measure:

> The Mason Tillman study uses seven sources to
> determine the firms that would be willing to do
> business with IDOT: Utilized contractors, bidder
> lists, pre-qualified business lists, vendor lists,
> certification lists, trade associations, and outreach.
> While both contractors that have done business with
> IDOT in the past (utilized contractors) and those who
> have bid on contracts (bidder lists) explicitly have
> shown a willingness to do business with IDOT, the
> Mason Tillman study offers no justification for why it
> is appropriate to consider the firms listed on the
> other sources as being willing to do business with
> IDOT. Given the information included in the report it
> is unclear whether this assumption of willingness is
> appropriate, nor is it clear how this assumption
> affects the measure of availability of DBE firms. If
> firms that are not ready, willing and able to perform
> work for IDOT are included in the measure of
> availability, the measure of availability is biased,
> and the disparity index is invalid.

(Guryan Rep., Ex. 61 to Pl.'s Mem., ECF No. 382-1, at 11.)

With respect to underutilization, Midwest argues that IDOT's disparity studies failed to rule out "capacity" as a possible explanation for the observed disparities. According to Dr. Guryan, because the studies did not account for capacity and other race-neutral factors, "they cannot rule out with a reasonable degree of certainty that any disparities observed might have been caused by these other factors and not by discrimination in the road construction industry." (Guryan Rebuttal Report, Ex. 62 to Pl.'s Mem., ECF No. 382-2, at 7.)

IDOT counters that on prime contracts under $500,000, capacity is a variable that makes little difference. Prime contracts of varying sizes under $500,000 were distributed to DBEs and non-DBEs alike at approximately the same rate. (2011 MTA Study, Ex. G to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-7, at 7-12.) According to IDOT, "[i]f the ability of DBEs to perform contracts was significantly less than the ability of [non-]DBEs then there should have been a significant difference in the rate of contracts under $500,000 awarded to the two groups." (IDOT Resp. to Pac. Legal Found., ECF 419, at 13.)

IDOT also argues that through regression analysis, the 2011 MTA Study demonstrated that "factors other than discrimination" did not account for the disparity between DBE utilization and availability. (*See,* 2011 MTA Study, Ex. G to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-7, at 1-4.) Despite Midwest's argument

that 2011 MTA Study took insufficient measures to rule out
capacity as a race-neutral explanation for the underutilization
of DBEs, the Supreme Court has indicated that a regression
analysis need not take into account "all measurable variables"
to rule out race-neutral explanations for observed disparities.
*Bazemore v. Friday,* 478 U.S. 385, 400 (1986) *(per curiam)*.

The Court finds Midwest's criticisms insufficient to rebut
IDOT's evidence of discrimination or discredit IDOT's methods of
calculating DBE availability.  First, the "evidence" offered in
Dr. Guryan's reports is speculative at best.  (Guryan Rep.,
Ex. 61 to Pl.'s Mem., ECF No. 382-1, at 11 ("[I]t is unclear
whether [IDOT's] assumption of willingness is appropriate, nor
is it clear how this assumption affects the measure of
availability of DBE firms."); Guryan Rebuttal Rep., Ex. 62 to
Pl.'s Mem., ECF No. 382-2 ("[IDOT] cannot rule out with a
reasonable degree of certainty that any disparities observed
might have been caused by . . . other factors and not by
discrimination.").)  For a reasonable jury to find in Midwest's
favor, Midwest would have to come forward with "credible,
particularized evidence" of its own, such as a neutral
explanation for the disparity, or contrasting statistical data.
*Adarand VII,* 228 F.3d at 1175 (10th Cir. 2000).  Midwest fails
to make this showing here.

Second, IDOT's method of calculating DBE availability is consistent with the Federal Regulations and has been endorsed by the Seventh Circuit. The Federal Regulations approve a variety of methods for accurately measuring ready, willing, and available DBEs, such as the use of DBE directories, Census Bureau data, and bidders lists. 49 C.F.R. § 26.45(c). These are precisely the methods MTA adopted in calculating DBE availability. (*See,* 2011 MTA Study, Ex. G to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-7, at 7-2 ("Sources included government listings, certification lists, trade association and chamber of commerce membership lists, unsuccessful bidders, Illinois pre-qualified businesses, other agency vendor lists, and business community meetings.").)

In *Northern III,* the Seventh Circuit approved NERA's "custom census" approach as consistent with the Federal Regulations. *Northern III,* 473 F.3d at 723; *see also, Sherbrooke Turf,* 345 F.3d at 973. The court rejected plaintiff Northern's argument that DBE availability should have been calculated based on a simple count of "registered and prequalified DBEs under Illinois law," finding no requirement in the Federal Regulations "that a recipient must so narrowly define the scope of ready, willing, and available firms." *Northern III,* 473 F.3d at 723. The court also rejected the notion that an availability measure should distinguish between prime and subcontractors, cautioning

- 54 -

that "[i]t would make little sense to separate prime contractor and subcontractor availability as suggested by [the plaintiff] when DBEs will also compete for prime contracts and any success will be reflected in the recipient's calculation of success in meeting the overall goal." *Id.*

Through the 2004 NERA Study, 2011 MTA Study, and Goal-Setting Reports, the IDOT Defendants have provided evidence of discrimination in the Illinois road construction industry and a method of DBE availability calculation that is consistent with both the Federal Regulations and *Northern III.* In response, Midwest has offered only conjecture about how NERA and MTA's supposed failure to account for capacity may or may not have impacted the studies' results. Although Dr. Guryan's expert reports cast doubt on the validity of IDOT's methodology, they fail to provide any independent statistical analysis or other evidence demonstrating actual bias. Without this showing, the record fails to demonstrate a lack of evidence of discrimination or actual flaws in IDOT's availability calculations.

### 2. *Burden on Non-DBE Subcontractors*

The remainder of the Court's narrow tailoring analysis focuses on three of the relevant *Paradise* Factors, beginning with the program's burden on third parties. Midwest argues that "by achieving goals based on total contract dollars with only subcontract dollars, non-DBE specialty contractors — who are the

direct competitors of DBEs — are necessarily and disproportionately burdened." (Pl.'s Mem., ECF No. 374 at 46.) As evidence of this burden, Midwest argues that its earnings on fencing and guardrail subcontracts dropped from approximately $5 million to $3 million from 2009 to 2010, and its market share of such work decreased dramatically. Overall, from 2006 to 2013, Midwest claims losses of more than $8 million resulting from unsuccessful bids on IDOT contracts.

Downplaying the program's impact on Midwest, the IDOT and Federal Defendants counter that from 2007 to 2010, Midwest still out-earned the most competitive fencing and guardrail DBEs by $38 million, and had higher subcontracting receipts than three out of four of the most competitive fencing and guardrail DBEs. The Federal Defendants also point to testimony from Timothy Bell, Midwest's president, offering alternative explanations for the decline in Midwest's sales, including the private industry and highway contract economy, and general competitiveness of the marketplace. Mark Bell and John Bell, co-owners and vice-presidents of Midwest, offered similar testimony.

The parties disagree about whether the program has resulted in an overconcentration of DBEs in the fencing and guardrail industry. As evidence of overconcentration, Midwest identifies six DBEs as its competitors and provides an analysis of 18 contracts that it claims "shows DBE goals are estimated and

achieved using high percentages of guardrail and fencing dollars." (Pl.'s L.R. 56.1 Stmt., ECF No. 373, ¶¶ 157–158.) IDOT prepared its own overconcentration study comparing the total number of prequalified fencing and guardrail contractors to the number of DBEs that also perform that type of work and determined that no overconcentration problem existed. (See, Carol Lyle Dep., Ex. E to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-5, at 218–219, Carol Lyle Aff., Ex. 20 to IDOT Defs.' L.R. 56.1 Stmt.) Midwest challenges the selection of contractors used in IDOT's study. Although the businesses IDOT selected are prequalified to perform fencing and guardrail work, Midwest argues that many may be general contractors that do not actually perform work in this area, thereby inflating the number of non-DBEs fencing and guardrail contractors. Specifically, Midwest argues that the overconcentration study included two large general contractors who do not perform fencing and guardrail subcontracting, while omitting two small fencing and guardrail subcontractors who do perform such work.

Despite these challenges, Midwest has not shown IDOT's determination that overconcentration does not exist among fencing and guardrail contractors to be unreasonable. In *Geyer Signal,* the court rejected a similar challenge to the Minnesota Department of Transportation's overconcentration study. *Geyer Signal,* 2014 WL 1309092, at *20. The court explained that

requiring the state to recalibrate overconcentration calculations every time they were challenged by a business would result in an "impossible burden" on the Government. *Id.*

The fact that IDOT sets contract goals as a percentage of total contract dollars does not demonstrate that IDOT imposes an undue burden on non-DBE subcontractors. To the contrary, IDOT is acting within the scope of the Federal Regulations, which require goals to be set in this manner. 49 C.F.R. § 26.53(i). The Court has already recognized that setting goals as a percentage of total contract value addresses the widespread, indirect effects of discrimination that may prevent DBEs from competing as primes in the first place. As Justice Powell stated in *Wygant,* when effectuating a narrowly tailored remedy to cure the effects of discrimination, a "sharing of the burden" by innocent parties, here non-DBE subcontractors, is permissible. *Wygant,* 476 U.S. at 281. Because IDOT has carried its burden in providing persuasive evidence of discrimination in Illinois, the Court finds that such sharing of the burden is permissible here.

### 3. *Use of Race-Neutral Alternatives*

IDOT has identified several race-neutral programs it has used to increase DBE participation, including its Supportive Services, Mentor-Protégé, and Model Contractor Programs. The programs provide workshops and training that help small

businesses build bonding capacity, gain access to financial and project management resources, and learn about specific procurement opportunities. To demonstrate that these programs cannot remedy discrimination on their own, IDOT has conducted several studies involving zero-participation goals. For instance, from 2006–2008, IDOT let approximately half of all contracts without any DBE participation goal. Of those contracts, DBEs received only .84% of the total dollar value awarded. Midwest challenges the probative value of this figure, arguing that it conflicts with a zero-goal experiment introduced in *Northern II* and that many of the zero-goal contracts may not have had contained any "DBE-able" line items.

Nevertheless, the Court finds IDOT fully compliant with the Federal Regulations. In *Northern II,* the Court examined the same set of race-neutral alternatives, and found that IDOT employed almost all of the methods suggested in the Regulations to maximize DBE participation without resorting to race — such as providing assistance in obtaining bonding and financing, implementing a supportive services program, and providing technical assistance. *Northern II,* 473 F.3d at 724 (citing 49 C.F.R. § 26.51(b)). This Court agrees, and finds that IDOT has made "'serious, good faith consideration of workable race-neutral alternatives.'" *Fisher,* 133 S.Ct. at 2420 (quoting *Grutter,* 539 U.S. at 339).

## *4. Duration and Flexibility*

Like the authorizing statute for the Federal Program, the state statute through which the Federal Program is implemented is limited in duration and must be reauthorized every two to five years. *See,* 30 ILCS 575/9.

Midwest argues that the goal-setting process on individual contracts is so inflexible that it amounts to an impermissible "quota system," forcing prime contractors "to use all DBEs on all DBE-able work, thereby precluding non-DBEs from receiving work in those categories." (Midwest Resp., ECF No. 424-2, at 13.) IDOT counters that its application of the Federal Program's waiver provisions demonstrates flexibility. From 2006 to 2014, IDOT granted 270 of the 362 good faith waiver requests that it received. Although Midwest makes a boilerplate objection that this data was not previously disclosed, it does not develop this argument. Indeed, Midwest itself cites to annual waiver statistics. (*See,* Pl.'s L.R. 56.1 Stmt., ECF No. 373, ¶¶ 138–39.) Though the waivers IDOT granted only concerned a small fraction of the total contracting dollars that IDOT awarded (1.2% in 2007 and .25% in 2009), it remains undisputed that IDOT granted the majority of waiver requests that it received. In addition, in the same time period, IDOT granted 1,002 post-award waivers (granted after performance on a contract begins) on over $36 million in contracting dollars.

Notably, IDOT granted the only good faith efforts waiver that Midwest requested.  In 2008, Midwest, bidding as a prime, submitted a utilization plan showing 0% DBE participation, despite the contract's 15% goal.  Ultimately, Midwest demonstrated to IDOT that it made good faith efforts to meet the goal, but was unable to do so.  IDOT granted Midwest's waiver request, reducing the goal from 15% to zero.

Despite receiving a waiver, Midwest argues waiver availability sharply declined in 2010 under Hannig's leadership of IDOT.  In support of this argument, Midwest cites to evidence — much of it from *Dunnet Bay v. Hannig* — describing the political pressure on IDOT to drive up DBE participation and Hannig's desire to have "high goals and no waivers."  (Midwest L.R. 56.1 Stmt., ECF No. 373, ¶ 177).  To the extent that the statements from *Dunnet Bay* are evidence here, the Court agrees with Judge Mills that "despite any political pressure . . . and regardless of the personal views of the Secretary of Transportation or anyone else, the undisputed facts establish that IDOT did not have a 'no-waiver policy.'"  *Dunnet Bay,* 2014 WL 552213, at *27.

Finally, Midwest challenges the waiver provisions on the additional basis that they are "void for vagueness" and "void on their face."  (Pl.'s Mem., ECF No. 374, at 52–57.)  A statute may be vague for one of two reasons: (1) "if it fails to provide

people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits," or (2) "if it authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado,* 530 U.S. 703, 732 (2000). However, where First Amendment freedoms are not involved, vagueness challenges "must be examined in the light of the facts of the case at hand." *United States v. Mazurie,* 419 U.S. at 550 (1975); *see, e.g., Geyer Signal,* 2014 WL 1309092, at *17 (rejecting claim that Federal Program was "facially unconstitutionally vague" where First Amendment rights were not at issue). Turning to the facts of this case — in which Midwest applied for and received a waiver — the Court cannot conclude that the waiver provisions are impermissibly vague. In determining whether good faith efforts have been made, IDOT takes into consideration the substantial guidance provided in Appendix A to the Regulations, examining factors such as how the contractor solicited quotes from DBEs and what directories they relied on to locate DBEs. (Carol Lyle Dep., Ex. E to IDOT Defs.' L.R. 56.1 Stmt., ECF No. 368-5, at 125-127.) Upon reviewing Midwest's utilization plan, IDOT noted that Midwest had provided documentation "indicating contact with several DBEs that opted not to bid on the job" and "worked diligently with the district office by following through on all suggestions in order to meet the goal." (Ex. H to Fed Defs.' Mem., ECF No. 371-9, at 1260.) Because

Midwest's experience demonstrates the flexibility of the Federal Program in practice, the Court cannot conclude that the program amounts to an impermissible quota system that is unconstitutional on its face.

Midwest has not presented any affirmative evidence showing that IDOT's implementation of the Federal Program imposes an undue burden on non-DBEs, fails to employ race-neutral measures, or lacks flexibility. Accordingly, the Court grants the IDOT Defendants' Motion for Summary Judgment on Counts VI-VII and IX-XII.

### E. Facial & As-Applied Challenges to the Tollway Program

Although the Tollway Program exists independently of the Federal Program, the two have much in common. Midwest's challenge, and therefore the Court's analysis, parallel the previous section. Midwest argues that the Tollway Program is unconstitutional on its face and as applied. To withstand Midwest's challenge, the Tollway Program (1) must serve a compelling governmental interest, and (2) be narrowly tailored to further that interest. *Northern III,* 473 F.3d at 720.

#### 1. Compelling Interest

Like the Federal and IDOT Defendants, the Tollway must first show that its compelling interest in remedying discrimination in Illinois' road construction industry rests on

a "strong basis in evidence." *Croson,* 488 U.S. at 500 (quoting *Wygant*, 476 U.S. at 277–78) (internal quotations omitted). As evidence of its compelling interest, the Tollway primarily relies on the 2006 NERA Study, which assessed the disparity between the Tollway's utilization of DBEs and their availably. As in the 2004 study performed for IDOT, NERA employed a "custom census" approach to calculate DBE availability. After determining availability, NERA examined the Tollway's contract data to determine utilization. The 2006 NERA Study reported statistically significant disparities for all race and sex categories examined. (2006 NERA Rep., Ex. L to Tollway Defs.' L.R. 56.1 Stmt., ECF No. 384-12, at 270–74.)

NERA also conducted an economy-wide analysis examining other race and sex disparities in the wider construction economy from 1979 to 2002. Controlling for race- and gender-neutral variables, this portion of the analysis showed a significant negative correlation between a person's race or sex and their earning power and ability to form a business. According to the Tollway, "[b]ecause the regression analysis controlled for all significant independent variables and found that negative statistically significant disparities remained as to the dependent variable — here race/sex — [it] concluded that the analyses raised a strong inference that the observed disparities

were consistent with discrimination in the road construction industry." (Tollway Defs.' Mem., ECF No. 380, at 13.)

In 2013, the Tollway commissioned a new disparity study from Colette Holt & Associates. Although the study is currently underway, Colette Holt has completed an economy-wide analysis similar to NERA's using updated census data gathered from 2007 to 2011. Colette Holt's updated census analysis controlled for variables such as education, age, and occupation and still found lower earnings and rates of business formation among women and minorities as compared to white men.

Midwest's attacks on the Tollway's 2006 NERA Study mirror those lodged against the 2004 NERA Study and 2011 MTA Study. First, Dr. Guryan suggests that the 2006 NERA Study's availability determination is skewed because it did not consider whether "available firms" have the actual capacity to take on Tollway projects:

> The NERA study defines its market area as the state of Illinois, and limits the firms in the availability measure to those operating in specific industries. As long as a firm is operating in Illinois in one of these industries that firm is assumed to be ready, willing and able to do business with [the Tollway] regardless of whether that firm has ever expressed interest in working with [the Tollway] (either by bidding on or receiving a contract or any other show of willingness to work with [the Tollway]) or has the capacity to perform the required work. It is likely that some firms included in this calculation are either not willing or not able to work with [the Tollway]. It is unclear how the inclusion of these firms impacts the calculation of the DBE availability

measure, but it likely causes bias. If firms that are not ready, willing and able to perform work for ISTHA are included in the measure of availability, the measure of availability is biased, and the disparity index is invalid.

(Guryan Rep., Ex. 61 to Pl.'s L.R. 56.1 Stmt., ECF No. 382-1, at 11.) Second, Dr. Guryan posits that the 2006 NERA Study's disparity calculation is biased because it failed to take into account capacity. (*See,* Guryan Rebuttal Rep., Ex. 62 to Pl.'s L.R. 56.1 Stmt, ECF No. 382-2, at 6 ("I explained that if women and minority owned firms are smaller on average than white male owned firms, the disparity index calculated in the NERA and Mason Tillman disparity studies would be less than 100 percent even if there were no discrimination in the road construction industry.").)

The Tollway defends the 2006 NERA Study on numerous grounds. First, the Tollway argues that capacity metrics should not be taken into account because they are themselves a product of indirect discrimination. Second, the Tollway argues that capacity need not be taken into account because the construction industry is elastic in nature, and firms can easily "ramp up" or "ratchet down" to accommodate the size of a project. Indeed, Midwest, which describes itself as a small "specialty" contractor, has bid as a prime contractor on more than a dozen contracts in excess of $1 million. (Fed. Defs.' L.R. 56.1 Resp., ECF No. 414, ¶ 39.) Third, the Tollway argues that

NERA's economy-wide analysis revealed a significant negative correlation between an individual's race and sex and their earning power and ability to own or form a business, showing that the underutilization of DBEs is consistent with discrimination. Ultimately, the Tollway argues that it is entitled to summary judgment because Midwest has challenged the validity of 2006 NERA Study with little more than conjecture. For example, the Tollway points out that Dr. Guryan fails to define the term "capacity," in either of his reports, and offers no specific metrics — such as revenue, number of employees, or bonding limits — that should be used to account for "capacity."

To successfully rebut the Tollway's evidence of discrimination, Midwest must come forward with a neutral explanation for the disparity, show that the Tollway's statistics are flawed, demonstrate that the observed disparities are insignificant, or present contrasting data of its own. *See, Concrete Works IV,* 321 F.3d at 959 (citation omitted). Again, the Court finds that Midwest has failed to make this showing. The evidence offered through Dr. Guryan's reports is far too speculative to create a disputed issue of fact suitable for trial. (*See, e.g.,* Guryan Rep., Ex. 61 to Pl.'s L.R. 56.1 Stmt., ECF No. 382-1, at 11 ("It is unclear how the inclusion of these firms impacts the calculation of the DBE availability measure, but it likely causes bias."); Guryan Rebuttal Rep.,

Ex. 62 to Pl.'s L.R. 56.1 Stmt, ECF No. 382-2, at 8 ("[Disparities] may be caused in part by discrimination in the road construction industry, but they may also be caused by other forms of discrimination and by factors other than discrimination.").) Accordingly, the Court finds that the Tollway Defendants have established a "strong basis in evidence" for the Tollway Program.

## 2. Narrow Tailoring

The Court next turns to the *Paradise* Factors to determine whether the Tollway Program is narrowly tailored. Midwest argues that the Tollway program imposes an undue burden on non-DBE subcontractors. As evidence on this burden, Midwest claims to have lost more than $9 million from 2006 to 2010 on Tollway contracts in which it was the low bidder. The Tollway's damages expert counters that Midwest was not the low bidder, or that the low bidder could not be determined on most of these contracts, and that the impact of the Tollway Program on Midwest's profit margins was minimal. (*See,* Pl.'s Resp. to Tollway Defs.' L.R. 56.1 Stmt., ECF No. 428, ¶ 98 (admitting that profit margins remained relatively constant, averaging 22.81% from 2000 to 2005, and 21.5% from 2006 to 2011.).)

Like IDOT, the Tollway sets individual contract goals as a percentage of the value of the entire contract based on the availability of DBEs to perform particular line items. Midwest

again charges that this policy reveals a "mismatch" between the Tollway's "remedy and goal." (*See,* Pl.'s Mem., ECF No. 90, at 11–12.)  The Court reiterates that setting goals as a percentage of total contract dollars does not demonstrate an undue burden on non-DBE subcontractors.  The Tollway's method of goal setting is identical to that prescribed by the Federal Regulations, which this Court has already found to be supported by "strong policy reasons." *See, Northern II,* 2005 WL 2230195, at *20. Although the Tollway is not beholden to the Federal Regulations, those policy reasons are no different here.

Midwest relies on a single sentence from *Wygant,* which concerned a program that limited minority schoolteacher layoffs, as support for much of its undue burden argument: "While hiring goals impose a diffuse burden, often foreclosing only one of several opportunities, layoffs impose the entire burden of achieving racial equality on particular individuals, often resulting in serious disruption of their lives." *Wygant,* 476 U.S. at 283.  Parsing this language, Midwest argues that the Tollway Program is unduly burdensome because it imposes a burden that is "neither light nor diffuse." (Pl.'s Mem. Vol. II, ECF No. 387.)  As noted previously, however, the sharing of a remedial program's burden "is itself insufficient to warrant the conclusion that the program is not narrowly tailored." *Adarand VII,* 228 F.3d at 1183.  Here, where the Tollway Defendants have

provided persuasive evidence of discrimination in the Illinois road construction industry, the Court finds the Tollway Program's burden on non-DBE subcontractors to be permissible.

Turning to the efficacy of race-neutral measures, the Tollway has implemented at least four race-neutral programs to increase DBE participation, including: a program that allows smaller contracts to be unbundled from larger ones, a Small Business Initiative that sets aside contracts for small businesses on a race-neutral basis, partnerships with agencies that provide support services to small businesses, and other programs designed to make it easier for smaller contractors to do business with the Tollway in general. The Tollway's race-neutral measures are consistent with those suggested under the Federal Regulations. *See,* 49 U.S.C. § 26.51. The Court finds that the availability of these programs, which mirror IDOT's, demonstrate "'serious, good faith consideration of workable race-neutral alternatives.'" *Fisher,* 133 S.Ct. at 2420 (quoting *Grutter,* 539 U.S. at 339).

In terms of flexibility, the Tollway Program, like the Federal Program, provides for waivers where prime contractors are unable to meet DBE participation goals, but have made good faith efforts to do so. The standards and procedures for obtaining a waiver are described in detail in the Special Provision, which is provided in every set of documents a bidder

receives and is available to the public online. Like IDOT, the Tollway adheres to the Federal Regulations, 49 C.F.R. pt. 26, App. A, in assessing whether a bidder has made good faith efforts. As under the Federal Program, the Tollway Program also allows bidders who have been denied waivers to appeal. From 2006 to 2011, the Tollway granted waivers on approximately 20% of the 200 prime construction contracts it awarded. Although Midwest argues that the Tollway did not award any good faith efforts from 2009 to 2012, the Tollway responds that it did not receive any waiver requests during this time period. Midwest has provided no evidence to support its claim that the Tollway Program is a "*de facto* quota system in practice." (Pl.'s Mem., ECF No. 387, at 11.) Because the Tollway demonstrated that waivers are available, routinely granted, and awarded or denied based on guidance found in the Federal Regulations, the Court finds the Tollway Program sufficiently flexible.

Midwest's final challenge to the Tollway Program is that its goal-setting process is "secretive and impossible to scrutinize." (Pl.'s Mem. Vol. II, ECF No. 387, at 15). However, the Tollway has plainly laid out the two goal-setting procedures it has employed since the program's enactment. The Tollway clearly stated how DBE availability is determined on individual contracts:

> Pre May 2011, the availability figures used by the Tollway came from a spreadsheet created in conjunction with the NERA Study that listed the number of certified DBEs in the ILUCP for all scopes of work, and post May 2011, the availably figure came from Table 3.19 of the NERA Study itself, which lists weighted NAICS code availability.

(Tollway Defs.' Reply, ECF No. 448, at 28.)   The Court finds nothing "secretive" about the Tollway's methods.

The Tollway Defendants have provided a strong basis in evidence for their DBE Program.   Midwest, by contrast, has not come forward with any concrete, affirmative evidence to shake this foundation.   On balance, the *Paradise* factors — the burden on non-DBEs, the availability of race-neutral measures, and the flexibility afforded through waivers — demonstrate that that the Tollway Program is narrowly tailored.   Accordingly, the Court grants the Tollway Defendants' Motion for Summary Judgment on Counts XIII–XVII.

## IV.   CONCLUSION

For the reasons stated herein, the Court rules as follows:

1.   Dismisses the portion of Count V pertaining to the Target Market Program for lack of standing;

2.   Denies the Federal and IDOT Defendants' Motions to Exclude the Expert Testimony and Opinions of Dr. Jonathan Guryan [ECF Nos. 335 & 341];

3.   Grants the Federal Defendants' Motion for Summary Judgment [ECF No. 369];

4.    Grants   the   IDOT   Defendants'   Motion   for   Summary Judgment [ECF No. 366];

5.    Grants   the   Tollway   Defendants'   Motion   for   Summary Judgment [ECF No. 378]; and

6.    Denies   Midwest's   Motion   for   Summary   Judgment   [ECF No. 372].

**IT IS SO ORDERED.**

_____
      Harry D. Leinenweber, Judge
      United States District Court

Dated: 3/24/2015